**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE: ICE LIBOR ANTITRUST LITIGATION

C.A. 1:19-cv-00439-GBD

Hon. George B. Daniels

<u>ORAL ARGUMENT REQUESTED</u>

**MEMORANDUM OF LAW IN SUPPORT OF THE FOREIGN DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION**
**COMPLAINT FOR LACK OF PERSONAL JURISDICTION, IMPROPER VENUE,**
<u>**AND/OR INADEQUATE SERVICE**</u>

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND .......................................................................................... 4

A.    Plaintiffs ............................................................................................................ 4

B.    Defendants ......................................................................................................... 4

C.    USD ICE LIBOR ............................................................................................... 5

D.    Jurisdictional Allegations ................................................................................. 6

LEGAL STANDARDS .................................................................................................... 8

ARGUMENT ................................................................................................................. 10

I.     FOREIGN DEFENDANTS ARE NOT SUBJECT TO SPECIFIC
JURISDICTION ................................................................................................. 10

A.    Any Alleged Wrongful Conduct Occurred Outside the United States ............ 13

       1.    *USD ICE LIBOR Submissions Were Determined and Submitted Outside the
United States* ..................................................................................... 13

       2.    *USD ICE LIBOR Was Administered and Set from London* ................... 15

       3.    *Meetings Attended by Certain Foreign Defendants and Regulators in the United
States Cannot Establish Personal Jurisdiction* ...................................... 17

B.    Plaintiffs' Purposeful Availment Theory Fails ................................................ 18

C.    Plaintiffs' Causal Effects Theory Fails ............................................................ 22

II.    PLAINTIFFS FAIL TO ESTABLISH JURISDICTION BASED ON THE
CONTACTS OF FOREIGN DEFENDANTS' ALLEGED AGENTS AND CO-
CONSPIRATORS ............................................................................................... 24

A.    Plaintiffs' Agency Allegations Fail to Establish Personal Jurisdiction ........... 24

B.    Plaintiffs' Conspiracy Jurisdiction Allegations Fail ....................................... 27

      1.     *To Comport with Due Process, Personal Jurisdiction Must Be Based on a Defendant's Efforts to Connect Itself to the Forum* ...............................................27

      2.     *Plaintiffs' Conspiracy Allegations Do Not Satisfy Any Applicable Jurisdictional Rule or Statute* ..........................................................................................30

**III.    DUE PROCESS REQUIRES PLAINTIFFS TO ESTABLISH JURISDICTION BASED ONLY ON FOREIGN DEFENDANTS' CONTACTS WITH NEW YORK** .........31

**IV.    FOREIGN DEFENDANTS DID NOT CONSENT TO JURISDICTION IN NEW YORK**..........................................................................................................................31

**V.    FOREIGN DEFENDANTS ARE NOT SUBJECT TO GENERAL JURISDICTION** ...........................................................................................................32

A.    Foreign Defendants Are Not "At Home" in New York....................................................32

B.    No Foreign Defendant Consented to General Jurisdiction in New York .........................34

**VI.    PLAINTIFFS' FAILURE TO SUFFICIENTLY PLEAD PROPER VENUE UNDER THE CLAYTON ACT PRECLUDES PERSONAL JURISDICTION OVER VENUE DEFENDANTS** ........................................................................................................36

**VII.    CONSIDERATIONS OF FAIR PLAY, SUBSTANTIAL JUSTICE, AND INTERNATIONAL COMITY COMPEL DISMISSAL**............................................37

**VIII.    PLAINTIFFS HAVE FAILED TO SERVE THE SERVICE DEFENDANTS**.........38

**CONCLUSION** ........................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*7 W. 57th St. Realty Co.* v. *Citigroup, Inc. LLC*,
   2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) (Gardephe, J.) ..............................12n, 23n, 30n

*Alibaba Grp. Holding Ltd.* v. *Alibabacoin Found.*,
   2018 WL 2022626 (S.D.N.Y. Apr. 30, 2018)................................................................. 15-16

*In re Aluminum Warehousing Antitrust Litig.*,
   2015 WL 6472656 (S.D.N.Y. Oct. 23, 2015) .........................................................................10

*In re Aluminum Warehousing Antitrust Litig.*,
   90 F. Supp. 3d 219 (S.D.N.Y. 2015)....................................................................25, 27, 31

*Australia and New Zealand Banking Group Ltd.* v. *APR Energy Holding Ltd.*,
   2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017)..........................................................................33

*Beach* v. *Citigroup Alternative Invs. LLC*,
   2014 WL 904650 (S.D.N.Y. Mar. 7, 2014) ....................................................................9, 19

*BGDG Enters., LLC* v. *Barley & Swine*,
   2014 WL 12479650 (W.D. Tex. Jan. 23, 2014) .....................................................................15

*Brown* v. *Lockheed Martin Corp.*,
   814 F.3d 619 (2d Cir. 2016)........................................................................... 33-34, 36

*Cassano* v. *Altshuler*,
   186 F. Supp. 3d 318 (S.D.N.Y. 2016)....................................................................................38

*Charles Schwab Corp.* v. *Bank of America Corp.*,
   883 F.3d 68 (2d Cir. 2018)........................................................................................ *passim*

*Contant* v. *Bank of America Corp.*,
   385 F. Supp. 3d 284 (S.D.N.Y. 2019)....................................................................................30

*Daimler AG* v. *Bauman*,
   134 S. Ct. 746 (2014) ............................................................................................... *passim*

*Daniel* v. *American Bd. of Emergency Medicine*,
   428 F.3d 408 (2d Cir. 2005)....................................................................................... 36-37

*Davis* v. *Farmers' Co-op. Equity Co.*,
   262 U.S. 312 (1923).............................................................................................................35

*De Castro* v. *Sanifill, Inc.*,
    198 F.3d 282 (1st Cir. 1999) ........................................................................26

*Dennis* v. *JPMorgan Chase & Co.*,
    343 F. Supp. 3d 122 (S.D.N.Y. 2018) ................................................. *passim*

*Expoconsul Int'l, Inc.* v. *A/E Systems, Inc.*,
    711 F. Supp. 730 (S.D.N.Y. 1989) ..............................................................36n

*Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019) ...............................................11, 16n, 20, 22

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    2016 WL 1268267 (S.D.N.Y. Mar. 31, 2016) ("*Forex*") ........................................34

*FrontPoint Asian Event Driven Fund, L.P.,* v. *Citibank, N.A.*,
    2017 WL 3600425 (S.D.N.Y. Aug. 18, 2017) ...............................................16n, 34

*Gates* v. *Wilkinson*,
    2003 WL 21297296 (S.D.N.Y. June 4, 2003) ........................................................37

*Gucci Am., Inc.* v. *Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ........................................................... 31, 35, 37-38

*Harris Rutsky & Co. Ins. Servs., Inc.* v. *Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003) ......................................................................26

*Helicopteros Nacionales de Colombia, S.A.* v. *Hall*,
    466 U.S. 408 (1984) ..........................................................................24, 30

*Jazini* v. *Nissan Motor Co., Ltd.*,
    148 F.3d 181 (2d Cir. 1998) ........................................................10, 13, 22, 25

*Keeton* v. *Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) .....................................................................8-9, 19, 28

*Koontz* v. *St. Johns River Water Mgmt. Dist.*,
    133 S. Ct. 2586 (2013) ..............................................................................35

*Laydon* v. *Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
    2017 WL 1113080 (S.D.N.Y. Mar. 10, 2017) (Daniels, J.) ...........................................22

*Laydon* v. *Mizuho Bank, Ltd.*,
    2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.) ................................. *passim*

*Leasco Data Processing Equipment Corp.* v. *Maxwell*,
    468 F.2d 1326 (2d Cir. 1972) (abrogated on other grounds by *Morrison* v.
    *National Australia Bank, Ltd.*, 561 U.S. 247 (2010)) ........................................ 28-29

*Legal Servs. Corp.* v. *Velazquez*,
    531 U.S. 533 (2001)...............................................................................35

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) (Buchwald, J.) ......................................12n, 16n

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015)........................................................25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 1558504 (S.D.N.Y. Apr. 15, 2016).......................................................34

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 4773129 (S.D.N.Y. Sept. 12, 2016)......................................................32

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) .....................................................13n

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) .....................................................11

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
    673 F.3d 50 (2d Cir. 2012).....................................................................13

*Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013)..................................................................9, 37

*In re Lyondell Chem. Co.*,
    543 B.R. 127 (Bankr. S.D.N.Y. 2016)..........................................................26

*Madison Capital Markets, LLC* v. *Starneth Europe B.V.*,
    2016 WL 4484251 (S.D.N.Y. Aug. 23, 2016).....................................................37

*Marcus Uppe, Inc.* v. *Global Computer Enterprises, Inc.*, 2014 WL 6775282
    (W.D. Pa. Dec. 2, 2014) .....................................................................16

*Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. § 1782*,
    2018 WL 679884 (S.D.N.Y. Jan. 29, 2018) .....................................................33

*Mayatextil, S.A.* v. *Liztex U.S.A., Inc.*,
    1995 WL 131774 (S.D.N.Y. Mar. 23, 1995) .....................................................26

*Metro. Life Ins. Co.* v. *Robertson-Ceco Corp.*,
    84 F.3d 560 (2d Cir. 1996)....................................................................38

*Motorola Credit Corp.* v. *Uzan*,
    132 F. Supp. 3d 518 (S.D.N.Y. 2015).......................................................34-35

*Penguin Group (USA) Inc.* v. *American Buddha*,
609 F.3d 30 (2d Cir. 2010)........................................................................8

*Pincione* v. *D'Alfonso*,
506 F. App'x 22 (2d Cir. 2012) ...............................................................37

*In re Platinum & Palladium Antitrust Litig.*,
2017 WL 1169626 (S.D.N.Y. Mar. 28, 2017) (Woods, J.)...........................11n, 23

*Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*,
2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *adopted by* 2012 WL 3307486
(E.D.N.Y. Aug. 13, 2012)........................................................................30n

*Prime International Trading, Ltd.* v. *BP Plc*,
2019 WL 4071872 (2d Cir. Aug 29, 2019).............................................9, 12

*Qader* v. *Cohen & Slamowitz*,
2011 U.S. Dist. LEXIS 2388 (S.D.N.Y. Jan. 10, 2011).................................39n

*Robinson* v. *Overseas Military Sales Corp.*,
21 F.3d 502 (2d Cir. 1994)....................................................................9, 13

*Royalty Network Inc.* v. *Dishant.com, LLC*,
638 F. Supp. 2d 410 (S.D.N.Y. 2009).........................................................16

*Rush* v. *Savchuk*,
444 U.S. 320 (1980)............................................................................8, 24

*Sanchez* v. *Hoosac Bank*,
2014 WL 1326031 (S.D.N.Y. Mar. 31, 2014) ...............................................39

*In re Shulman Transport Enterprises, Inc.*,
744 F.2d 293 (2d Cir. 1984)....................................................................28

*Sonera Holding B.V.* v. *Cukurova Holding A.S.*,
750 F.3d 221 (2d Cir. 2014).....................................................................33

*Sullivan* v. *Barclays PLC*,
2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) (Castel, J.).............................. *passim*

*Sunward Elecs., Inc.* v. *McDonald*,
362 F.3d 17 (2d Cir. 2004)........................................................................8

*In re Syngenta AG MIR 162 Corn Litig.*,
2016 WL 2866166 (D. Kan. May 17, 2016).................................................35

*Taylor* v. *Westor Capital Grp.*,
943 F. Supp. 2d 397 (S.D.N.Y. 2013).........................................................39n

*In re Terrorist Attacks*,
   349 F. Supp. 2d 765 (S.D.N.Y. 2005)................................................................30

*In re Terrorist Attacks on Sept. 11, 2001*,
   295 F. Supp. 3d 416 (S.D.N.Y. Mar. 2018) (Daniels, J.) ....................................14n

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 659 (2d Cir. 2013)................................................... 8-9, 13, 22

*Trzaska* v. *L'Oréal USA, Inc.*,
   2017 WL 6337185 (D.N.J. Dec. 12, 2017)................................................40

*U.S.* v. *Watchmakers of Switzerland Info. Ctr.*,
   133 F. Supp. 40 (S.D.N.Y. 1955) ...............................................................37n

*Union of Needletrades, Indus. and Textile Emps., AFL-CIO, CLC* v. *U.S. I.N.S.*,
   336 F.3d 200 (2d Cir. 2003)...................................................................29

*Unspam Techs., Inc.* v. *Chernuk*,
   716 F.3d 322 (4th Cir. 2013) .................................................................29

*Volkswagenwerk Aktiengesellschaft* v. *Beech Aircraft Corp.*,
   751 F.2d 117 (2d Cir. 1984)...................................................................26

*Walden* v. *Fiore*,
   134 S. Ct. 1115 (2014)....................................................................... *passim*

*Waldman* v. *Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016)......................................................... 9-10, 16, 23

*Water Splash, Inc.* v. *Menon*,
   137 S. Ct. 1504 (2017)............................................................................39

*Wilder* v. *News Corp.*,
   2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ............................................25

*Wyndham Hotel Group Canada, ULC* v. *683079 Ontario Ltd.*,
   2018 WL 2078704 (D.N.J. May 4, 2018) ..................................................40

*Zagger* v. *Cty. of Suffolk*,
   2010 WL 2671765 (E.D.N.Y. Jun. 28, 2010) ...........................................39

**Rules**

Federal Rule of Civil Procedure 4(f) .............................................................39, 39n

Federal Rule of Civil Procedure 4(f)(1)...........................................................39

Federal Rule of Civil Procedure 4(f)(2)(A) ..................................................................39

Federal Rule of Civil Procedure 4(f)(2)(B) ................................................................39n

Federal Rule of Civil Procedure 4(f)(2)(C)(ii)............................................................39n

Federal Rule of Civil Procedure 4(f)(3) ......................................................................39n

Federal Rule of Civil Procedure 4(h) ...........................................................................39

Federal Rule of Civil Procedure 4(k)(1)(C) .................................................................30

Federal Rule of Civil Procedure 4(k)(2) ................................................................30, 30n

Federal Rule of Civil Procedure 4(k)(2)(A) ...............................................................30n

Federal Rule of Civil Procedure 12(b)(2) ......................................................................1

Federal Rule of Civil Procedure 12(b)(3) ......................................................................1

Federal Rule of Civil Procedure 12(b)(5) .........................................................1, 38, 39n

Federal Rule of Civil Procedure 12(b)(6) ....................................................................39n

**Statutes**

15 U.S.C.
    § 1 (Sherman Act) ....................................................................................................12
    § 22 (Clayton Act) ...................................................................................................36

Connecticut General Statutes § 36a-428g .....................................................................36

New York Banking Law
    § 200........................................................................................................................34
    § 200-b ................................................................................................................34-35

Foreign Defendants[1] respectfully submit this joint memorandum of law in support of their motion to dismiss the Consolidated Amended Class Action Complaint (Dkt. 186) (the "Complaint" or "CAC") for lack of personal jurisdiction, improper venue, and/or inadequate service pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(3), and/or 12(b)(5).

## PRELIMINARY STATEMENT

As set forth in the Merits Brief, Plaintiffs' Complaint, alleging a multi-year conspiracy to manipulate U.S. Dollar ICE LIBOR ("USD ICE LIBOR"), suffers from multiple fatal flaws, each of which compels dismissal. With respect to the Foreign Defendants, each of which has its place of incorporation and principal place of business outside the United States, Plaintiffs' claim should be dismissed for the additional reason that Plaintiffs fail to plausibly allege facts establishing a *prima facie* case of personal jurisdiction over any Foreign Defendant.

The benchmark at issue in this matter, USD ICE LIBOR, was at all relevant times administered from London by a U.K. company, operating out of its London headquarters, and was based on panel banks' submissions that were made from outside the United States, primarily from London. While Plaintiffs fail to plausibly allege any misconduct at all, whatever conduct that could potentially give rise to Plaintiffs' claim would have occurred entirely outside the United States. Thus, under controlling Second Circuit precedent, Plaintiffs have failed to establish

---

[1] Foreign Defendants together refers to the Foreign Bank Defendants: Barclays Bank PLC, Barclays PLC, BNP Paribas S.A. ("BNP Paribas"), Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, Credit Suisse Group AG, Credit Suisse AG, Deutsche Bank AG, HSBC Holdings plc, HSBC Bank plc, Lloyds Bank plc, The Norinchukin Bank, Coöperatieve Rabobank U.A. ("Rabobank"), Royal Bank of Canada, The Royal Bank of Scotland Group plc, NatWest Markets Plc (f/k/a The Royal Bank of Scotland plc), National Westminster Bank Plc, Société Générale, Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui Financial Group Inc., Sumitomo Mitsui Banking Corporation Europe Ltd., UBS AG and UBS Group AG; and ICE Benchmark Administration Limited (f/k/a NYSE Euronext Rate Administration Limited) ("IBA"). MUFG Bank, Ltd. and Mitsubishi UFJ Financial Group Inc. are "Foreign Defendants" named in the CAC, but Plaintiffs do not claim to have effected service on these entities. Accordingly, these MUFG entities do not join Defendants' motion, but reserve all rights should Plaintiffs attempt to effectuate service in the future. Unless specified otherwise, all internal citations and quotation marks are omitted.

personal jurisdiction over the Foreign Defendants.

In *Charles Schwab Corp.* v. *Bank of America Corp.*, 883 F.3d 68 (2d Cir. 2018) ("*Schwab*"), the Second Circuit held that the foreign bank defendants in that USD BBA LIBOR lawsuit, many (but not all) of which are also defendants here, were not subject to personal jurisdiction as to certain claims.  Similar to the current action, *Schwab* involved allegations that the panel banks conspired to persistently suppress USD BBA LIBOR, as USD ICE LIBOR was known prior to its administration by the IBA, through artificially low submissions.  Plaintiffs in *Schwab*, like those here, also alleged that the foreign bank defendants or their affiliates conducted business activities in the United States that included the trading of billions of dollars of instruments alleged to have been affected by the alleged conspiracy.  The Court in *Schwab* held that because plaintiffs had failed to allege that defendants manipulated USD BBA LIBOR in the United States and had failed to allege that there was a causal connection between the supposed conspiracy to manipulate USD BBA LIBOR and defendants' alleged trading activities in the United States, those allegations failed to establish personal jurisdiction over the foreign defendants.  Numerous district courts considering factually similar cases, both before and after *Schwab*, have reached the same conclusion.  *See infra* 11, n.11.

In a failed attempt to sidestep this substantial body of authority, the Complaint offers conclusory and erroneous statements regarding the locations where certain Foreign Defendants supposedly made their USD ICE LIBOR submissions and where IBA supposedly administered USD ICE LIBOR.  But the Complaint lacks any factual basis to support these conclusory statements—which are contradicted by materials referenced in the Complaint and by Foreign Defendants' declarations—rendering them implausible.  Therefore, under settled law, they must be disregarded.

2

Alternatively, Plaintiffs suggest that Foreign Defendants are subject to personal jurisdiction because, as part of their ordinary business activities, they or their affiliates or subsidiaries allegedly issued or traded USD ICE LIBOR-based instruments in the United States that were supposedly affected by the alleged manipulation of USD ICE LIBOR. This theory of personal jurisdiction also fails under controlling precedent. In the context of purported conspiracies to manipulate a foreign benchmark, *Schwab* forecloses the exercise of personal jurisdiction based on the trading of financial instruments in the United States tied to that benchmark if the "transactions did not cause Defendants' false [benchmark] submissions" or "in some other way give rise to claims seeking to hold Defendants liable for those submissions." 883 F.3d at 84. Plaintiffs have failed to plausibly allege that requisite causal connection. They have pled no facts supporting their attenuated and conclusory assertion that any panel bank's funding desk, each of which supposedly was a net payer of USD ICE LIBOR, coordinated its alleged overseas manipulation with the alleged U.S.-based trading positions of other business units in that bank (let alone of its U.S. affiliates or subsidiaries).

Plaintiffs' remaining arguments also fail. *First*, Plaintiffs cannot establish personal jurisdiction over any Foreign Defendant based on the alleged conduct of domestic affiliates or alleged co-conspirators for at least two reasons: because Plaintiffs allege no in-forum conduct by those entities in furtherance of the alleged conspiracy, and because Plaintiffs fail to allege the requisite knowledge, direction, or control to establish an agency-like relationship. *Second*, no Foreign Defendant is subject to general jurisdiction in New York because none is "at home" in New York, and it is settled law that Defendants cannot consent to general jurisdiction by registering to do business under statutes like those at issue here. *Third*, accepting Plaintiffs' broad theories of jurisdiction, which are premised on allegations of misconduct abroad with no nexus to

3

the United States, would be unreasonable and threaten international comity.

*Finally*, with respect to certain Foreign Defendants, Plaintiffs' claim has additional deficiencies that warrant dismissal. Plaintiffs fail to establish proper venue as to Venue Defendants,[2] making their use of the Clayton Act's nationwide service of process provision improper as a matter of law. And, as to the Service Defendants,[3] Plaintiffs have failed to effect service consistent with Rule 4 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND

### A.    Plaintiffs

Plaintiffs are seven savings banks or pension funds based in Connecticut, Michigan, and Hawaii that purport to have transacted in 1-month or 3-month USD ICE LIBOR floating rate debt instruments and 1-month or 3-month USD ICE LIBOR receiver interest rate swaps ("USD ICE LIBOR Financial Instruments"), CAC ¶ 627, including (unspecified) direct transactions with some (but not all) Defendants. *Id.* ¶¶ 76-87. Plaintiffs allege a single federal antitrust claim against all Defendants, solely as to 1-month and 3-month USD ICE LIBOR.

### B.    Defendants

Foreign Defendants are each headquartered in and organized under the laws of a foreign country—in Europe, Asia, or Canada. Their contacts with the United States and New York (if any) represent a relatively small portion of their global business operations.[4] None of the

---

[2] *See infra* Section VI. Venue Defendants are: Credit Suisse Group AG, Lloyds Bank plc, The Royal Bank of Scotland Group plc, NatWest Markets Plc, National Westminster Bank Plc, Sumitomo Mitsui Banking Corporation Europe, Ltd, UBS Group AG. Mitsubishi UFJ Financial Group Inc. is a Venue Defendant, but has not been served.

[3] *See infra* Section VIII. Service Defendants are: Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, and BNP Paribas.

[4] Decl. of S. Dolmatch ¶¶ 3-8 (Lloyds Bank PLC); Decl. of H. Higuma ¶ 3 (SMBC); Decl. of H. Yoshikawa ¶¶ 2-4 (SMFG); Decl. of I. Jameson ¶¶ 2-4 (SMBCE); Decl. of J. Connors ¶¶ 4-8 (UBS Group AG and UBS AG); Decl. of R. McCarty ¶¶ 3-12 (The Royal Bank of Scotland Group plc, NatWest Markets Plc, and National Westminster Bank Plc); Decl. of C. Di Meglio ¶¶ 4-10 (Société Générale); Decl. of K. Ciccimarra ¶¶ 8-12 (Deutsche Bank); Decl. of B. Fontaine ¶¶ 4-7 (Crédit Agricole Corporate & Investment Bank); Decl. P. Minor ¶¶ 6-8 (Crédit Agricole S.A.); Decl.

4

individuals responsible for the determination or submission of any panel bank's USD ICE LIBOR submissions were based in the United States.[5]  Certain Foreign Defendants do not conduct any business in, or direct any business at, the United States at all.[6]

Each Foreign Defendant seeks the dismissal of Plaintiffs' claim on personal jurisdiction grounds, and Venue Defendants challenge venue in New York, and therefore, personal jurisdiction over Plaintiffs' claim on this additional ground.  Finally, Service Defendants seek dismissal for inadequate service of process, because Plaintiffs have failed to effect service through a method that comports with Rule 4.

## C.     USD ICE LIBOR

USD ICE LIBOR is an interest rate benchmark administered by IBA (which is incorporated under the laws of England and Wales) from its registered office in London.  It is set based on daily submissions from personnel at panel banks located entirely outside the United States, and primarily in London.[7]  Until February 1, 2014, the British Bankers' Association (the "BBA") oversaw USD LIBOR.  Like IBA, the BBA, the former LIBOR administrator, was located in London, England, was organized under U.K. Laws, and administered and set LIBOR from the U.K.  IBA and the BBA both administered and set the benchmark, both from the U.K.

The Complaint purports to allege a profit-driven conspiracy among IBA and the eighteen

---

of D. Hess ¶¶ 3-6 (Credit Suisse AG); Decl. of D. Kläy ¶¶ 3-7 (Credit Suisse Group AG); Decl. of Y. Yamaguchi ¶¶ 4, 7-9 (Norinchukin); Decl of J. Wright ¶¶ 4-19 (Barclays Bank PLC); Decl. of S. Shapiro ¶¶ 4-12 (Barclays PLC); Decl. of F. Draveny ¶¶ 3-7 (BNP Paribas); Decl. of K. Pisarczyk ¶¶ 2-6 (HSBC Holdings PLC); Decl. of L. Wulfson ¶¶ 2-5 (HSBC Bank plc); Decl. of P. Kirkpatrick ¶¶ 2-11 (Rabobank); Decl. of S. Tselikas ¶¶ 3, 5-10, 12, 17-20 (IBA); Decl. of P. Serritella ¶¶ 3-6 (Royal Bank of Canada).

[5] *See infra* n.9.

[6] These Foreign Defendants include, for example: Credit Suisse Group AG, HSBC Holdings plc, Mitsubishi UFJ Financial Group Inc., Sumitomo Mitsui Banking Corporation Europe, Ltd, UBS Group AG.

[7] Decl. of S. Tselikas ¶¶ 13-14.  Before December 2014, Reuters Limited (now named Refinitiv Limited), which is also incorporated under the laws of England and Wales, collected the Panel Banks' submissions and calculated the rate on behalf of IBA.  Decl. of S. Tselikas ¶ 13.

banks that contributed submissions used to calculate the USD ICE LIBOR benchmark to persistently suppress 1-month and 3-month USD ICE LIBOR rates and profit from USD ICE LIBOR Financial Instruments,[8] which are alleged to be expressly indexed to USD ICE LIBOR benchmark rates.  CAC ¶¶ 57, 627.

### D. Jurisdictional Allegations

Plaintiffs attempt to establish personal jurisdiction based on conclusory statements that Defendants manipulated USD ICE LIBOR from within the United States.  Plaintiffs generally claim—with no factual support or plausible allegations—that some or all Defendants:  (i) made suppressed USD ICE LIBOR submissions from within the United States (*see, e.g.*, CAC ¶ 340); (ii) administered and calculated USD ICE LIBOR from within the United States (*see, e.g.*, CAC ¶ 341); and/or (iii) published USD ICE LIBOR rates from within the United States and on U.S. wires (*see, e.g.*, CAC ¶ 342).  These conclusory statements are unsupported by any factual allegations and, in fact, are often contradicted by allegations in the Complaint.  Moreover, sworn declarations submitted by Foreign Defendants in support of this motion, confirm that all of the acts alleged to have caused the supposed manipulation—i.e., the panel banks' submission of USD ICE LIBOR rates and the administration of USD ICE LIBOR—occurred outside the United States.[9]

---

[8] USD ICE LIBOR Financial Instruments are defined as (1) 1-month or 3-month USD ICE LIBOR floating rate debt instruments and (2) 1-month or 3-month USD ICE LIBOR Interest Rate Swaps.  CAC ¶ 627.

[9] Decl. of S. Bullock ¶ 2 ("During the period from February 1, 2014 through the present, which plaintiffs allege as the class period, Lloyds Bank was the only entity within LBG responsible for USD ICE LIBOR submissions, and all of the employees who were responsible for determining and making Lloyds Bank's USD ICE LIBOR submissions were located in London."); Decl. of J. Wright ¶ 12 ("BBPLC's U.S. Dollar ICE LIBOR submissions are determined by employees in London and transmitted from London."); Decl. of J. Connors ¶ 9 ("During the Class Period, all employees who were responsible for the determination and submission of rates to ICE for use in the calculation of USD ICE LIBOR were located in London, United Kingdom, or Zurich, Switzerland."); Decl. of P. Serritella ¶ 7 ("Throughout the proposed class period, the individuals responsible for making ICE LIBOR submissions on behalf of RBC, including those individuals responsible for making U.S. Dollar ICE LIBOR . . . submissions, were employed in the United Kingdom and located in London, and they made ICE LIBOR submissions from London."); Decl. of R. McCarty ¶ 13 ("During the Class Period (from February 1, 2014 through the present), all submissions by NatWest Markets Plc and National Westminster Bank Plc of rates to the ICE Benchmark Administration Limited for use in the calculation of USD ICE LIBOR were both determined and transmitted from offices outside the United States."); Decl.

Plaintiffs also attempt to establish a connection to the United States based on meetings in New York of the Alternative Reference Rates Committee ("ARRC") attended by some, but not all, Defendants.  *See, e.g.*, CAC ¶ 343.  But as discussed in the Merits Brief at Part I.A.1, Plaintiffs do not plausibly allege any connection between the alleged conspiracy and those meetings—which were organized and attended by regulators and absent members of Plaintiffs' proposed class.

Plaintiffs further allege that Foreign Defendants aimed their supposed manipulation at the United States because they or their affiliates or subsidiaries purportedly marketed and traded USD ICE LIBOR Financial Instruments in the United States, including instruments governed by New York choice of law provisions and forum selection clauses (*see, e.g.*, CAC ¶¶ 97, 265, 344-46), and transferred profits from the alleged conspiracy using interstate wires to and from bank accounts in the United States (*see, e.g.*, CAC ¶ 347).  Plaintiffs do not, however, offer any factual

of J. Hilty ¶ 2 ("At all relevant times, Deutsche Bank AG's USD ICE London Interbank Offered Rate ("LIBOR") submissions were calculated and submitted in London, United Kingdom.  No employees responsible for Deutsche Bank AG's USD ICE LIBOR submissions were located in New York or in the United States."); Decl. of B. Fontaine ¶ 8 ("CACIB's contributions used in the calculation of USD ICE LIBOR were, and continue to be, determined and submitted in London."); Decl. of D. Hess ¶ 7 ("During the relevant time period, CSAG London Branch was responsible for the USD ICE LIBOR submissions, and all of the employees who were responsible for determining and submitting USD ICE LIBOR were located in London."); Decl. of Y. Yamaguchi ¶ 6 ("All Norinchukin employees and supervisors responsible for submitting U.S. Dollar ICE LIBOR rates to the IBA worked and work in England."); Decl. of I. Jameson ¶ 7 ("SMBCE's U.S. Dollar LIBOR submissions were not made, supervised, directed, or approved by any employee of SMBC (or any other SMBCE affiliate) in New York or anywhere else in the United States."); Decl. of C. Di Meglio ¶ 11 ("During the time that SG was on the US dollar ICE LIBOR panel, SG determined the level at which its US dollar ICE LIBOR contributions would be made in Paris, France, and transmitted those contributions to ICE Benchmark Administration in London, England."); Decl. of K. Kruidhof ¶ 2 ("At all relevant times, Rabobank employees responsible for the determination and submission of Rabobank's U.S. Dollar-denominated ICE LIBOR ("USD ICE LIBOR") were members of Rabobank's Treasury group resident in Rabobank's Utrecht and London branch office.  At no time was any Rabobank employee located in the United States responsible for the determination or submission of Rabobank's USD ICE LIBOR submissions."); Decl. of F. Draveny ¶ 14 ("While BNP Paribas maintains a branch in New York, neither the New York branch of BNP Paribas nor any other U.S.-based office, branch, agency, representative office, or entity that is or was a direct or indirect subsidiary of BNP Paribas had any responsibility for determining, making, or overseeing BNP Paribas's USD ICE LIBOR submissions."); Decl. of L. Wulfson ¶ 6 ("During the relevant time period, HSBC Bank plc's USD ICE LIBOR submissions were determined in and transmitted from HSBC Bank plc's offices in London and all of the employees who were responsible for determining and submitting USD ICE LIBOR were located in London."); Decl. of S. Tselikas ¶ 13 ("ICE LIBOR is administered and set on every applicable London business day from IBA's office in London.  The entire daily process of receiving submissions and calculating and publishing the rates is automated and overseen by operations personnel in London.").

7

support for these conclusory allegations and fail to plausibly allege a causal connection between these alleged activities and their claim.  Indeed, Plaintiffs do not even allege that they transacted at all with most Foreign Defendants, much less engaged in transactions that were in some way causally connected to the alleged rate-setting abroad.

Plaintiffs also allege that Foreign Defendants are subject to personal jurisdiction because they entered into an alleged conspiracy with U.S.-based persons and entities, and that they consented to general personal jurisdiction by registering a domestic branch location (*see* CAC ¶¶ 356-57).[10]  As detailed below, these theories are also insufficient to support the exercise of personal jurisdiction over Foreign Defendants or to establish proper venue as to Venue Defendants.

## LEGAL STANDARDS

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit."  *Penguin Group (USA) Inc.* v. *American Buddha*, 609 F.3d 30, 34 (2d Cir. 2010).  Personal jurisdiction may be general (all-purpose) or specific (conduct-linked).  *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673-74 (2d Cir. 2013).  In either case, it is a defendant-specific inquiry, *see Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984); *Rush* v. *Savchuk*, 444 U.S. 320, 331-32 (1980), that focuses on the contacts the defendant has with the forum, *Daimler AG* v. *Bauman*, 134 S. Ct. 746, 754 (2014); *Walden* v. *Fiore*, 134 S. Ct. 1115, 1121-22 (2014).  This inquiry is made on a claim-by-claim basis, *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004) ("[P]laintiff must establish the court's jurisdiction with respect to each claim asserted."), and a court must consider "[e]ach defendant's

---

[10] Plaintiffs also make a number of generalized and conclusory allegations about Foreign Defendants' activities in the forum.  *See, e.g.*, CAC ¶ 327.  To the extent Plaintiffs seek to establish general jurisdiction over Foreign Defendants on the basis that they are "at home" in the United States, such allegations are plainly insufficient under established law.

contacts . . . individually," *Keeton,* 465 U.S. at 781 n.13; *Schwab*, 883 F.3d at 84.  In a putative

class action, "[c]ontacts with unnamed class members may not be used as a jurisdictional basis."

*Beach* v. *Citigroup Alternative Invs. LLC*, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014).

To establish specific jurisdiction, a defendant's "suit-related conduct must create a

substantial connection with the forum State" that "must arise out of contacts that the defendant

*himself* creates with the forum State," and cannot be based on "contacts he makes by interacting

with other persons affiliated with the State."  *Walden*, 134 S. Ct. at 1121-23.  In analyzing a

defendant's contacts with the forum state, courts may look only at the "very activity" out of which

the "cause of action arises."  *Keeton*, 465 U.S. at 780; *see Waldman* v. *Palestine Liberation Org.*,

835 F.3d 317, 331 (2d Cir. 2016) (suit-related conduct is limited to the conduct that gives "rise to

the episode-in-suit"); *see also Prime International Trading, Ltd.* v. *BP Plc*, 2019 WL 4071872, at

*3 (2d Cir. Aug 29, 2019) (summary order) ("[T]he idea that [defendant] sought *benefits* in the

United States from their conduct abroad does not permit specific, personal jurisdiction either,

because it is the 'suit-related conduct' that is crucial – in other words, 'the conduct that could have

subjected them to liability.'").  Moreover, the forum must be the "focal point" or "nucleus" of a

plaintiff's underlying claim.  *Waldman*, 835 F.3d at 340.  Where, as here, the alleged misconduct

occurs outside the forum, and a plaintiff attempts to establish jurisdiction based on its in-forum

effects, the plaintiff must allege that the defendant "took intentional, and allegedly tortious, actions

. . . expressly aimed at the forum," and that its claims arise from those actions.  *In re Terrorist*

*Attacks*, 714 F.3d at 674; *see also Schwab*, 883 F.3d at 87-88.

To survive a motion to dismiss for lack of personal jurisdiction, a "plaintiff must make a

*prima facie* showing that jurisdiction exists."  *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL,*

732 F.3d 161, 167 (2d Cir. 2013).  While the pleadings are construed in the light most favorable

to the plaintiff, a court need not "draw argumentative inferences in the plaintiff's favor," *Robinson* v. *Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994), nor accept as true "a legal conclusion couched as a factual allegation," *Jazini* v. *Nissan Motor Co., Ltd.*, 148 F.3d 181, 185 (2d Cir. 1998).  For purposes of a 12(b)(2) motion, the Court may "look beyond the pleadings to affidavits and supporting materials submitted by the parties."  *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 6472656, at *2 (S.D.N.Y. Oct. 23, 2015).

## ARGUMENT

## I.    FOREIGN DEFENDANTS ARE NOT SUBJECT TO SPECIFIC JURISDICTION

The Second Circuit's controlling decision in *Schwab* mandates dismissal of Plaintiffs' claim against Foreign Defendants.  In *Schwab*, the Second Circuit held that plaintiffs failed to establish personal jurisdiction over foreign defendants alleged to have participated in an analogous alleged conspiracy to manipulate USD BBA LIBOR, as USD ICE LIBOR was known prior to IBA's administration, because plaintiffs failed to allege that the defendants manipulated USD BBA LIBOR *in the United States* or intended to cause harm *in the United States*.  Plaintiffs' claim here fails for the same reasons.

While the plaintiffs in *Schwab*, like Plaintiffs here, alleged that the foreign defendants and their affiliates also traded instruments linked to USD LIBOR in the United States, the Second Circuit held that such allegations were insufficient to establish personal jurisdiction for "claims premised solely on Defendants' false LIBOR submissions in London."  *Schwab*, 883 F.3d at 83. Building on the Second Circuit's holding in *Waldman* that suit-related conduct is limited to the conduct that gives "rise to the episode-in-suit," 835 F.3d at 331, *Schwab* went a step further and confirmed that a defendant's business activities that lack a causal connection to the alleged misconduct are not suit-related and, therefore, not jurisdictionally relevant.  883 F.3d at 84.

Specifically, the Second Circuit held that the trading of billions of dollars of USD BBA LIBOR-based instruments in the forum "did not cause [d]efendants' false LIBOR submissions to the BBA in London, nor did the transactions in some other way give rise to claims seeking to hold [d]efendants liable for those submissions." *Id.* Moreover, the mere fact that "the effects of LIBOR manipulation were likely to reach [the forum] does not mean that [d]efendants' conduct in London was 'expressly aimed' at that [forum]." *Id.* at 88.

Numerous district courts applying *Schwab* have likewise rejected attempts to establish jurisdiction over alleged conspiracies to manipulate benchmarks outside the United States simply because defendants allegedly traded instruments in the United States tied to that benchmark. *See Dennis* v. *JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 205-06 (S.D.N.Y. 2018) ("*BBSW*") ("[T]he Court concludes that *Charles Schwab* controls here and precludes a finding of personal jurisdiction—whether through the Foreign Defendants' direct transactions in BBSW-Based Derivatives with plaintiffs or through a conspiracy theory of jurisdiction—over plaintiffs' federal claims on the basis of the Foreign Defendants' transactions in BBSW-Based Derivatives in the United States."); *Fire & Police Pension Ass'n of Colo.* v. *Bank of Montreal*, 368 F. Supp. 3d 681, 697-99 (S.D.N.Y. 2019) ("*CDOR*"); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2019 WL 1331830, at *4 (S.D.N.Y. Mar. 25, 2019) ("*LIBOR VIII*") (*Schwab* "did not disturb [the court's] general ruling that, unless plaintiffs can plausibly allege that 'a defendant determined, or transmitted, a false LIBOR submission' from the United States," personal jurisdiction was lacking as to claims based on the alleged manipulation of USD BBA LIBOR, as opposed to claims brought against direct counterparties based on conduct other than the alleged manipulation). Pre-*Schwab* case law, including a decision by this Court, is in accord. *See, e.g., Laydon* v. *Mizuho Bank, Ltd.*

11

("*Laydon*"), 2015 WL 1515358, at *5-6 (S.D.N.Y. Mar. 31, 2015) (Daniels, J.).[11]

 In an attempt to avoid this precedent, Plaintiffs purport to allege a "profit-based conspiracy" akin to a separate set of claims at issue in *Schwab*—concerning alleged fraudulent omissions in direct sales of financial products by certain defendants to plaintiffs in the forum—for which jurisdiction was upheld.  *Schwab*, 883 F.3d at 82-84.  Casting their claim as a profit-motivated conspiracy does not, however, help Plaintiffs because they have not plausibly alleged the requisite *causal* connection between any in-forum sales of USD ICE LIBOR-linked Financial Products and the alleged antitrust violation upon which Plaintiffs base their claim—the suppression of USD ICE LIBOR.  *Id.* at 88.  The supposed conduct that gives rise to the "episode-in-suit"—here, alleged price fixing in violation of the Sherman Act—would have been complete once Defendants entered into an alleged conspiracy to restrain trade and, according to Plaintiffs' allegations, made submissions that artificially suppressed USD ICE LIBOR.  15 U.S.C. § 1.  As a result, Plaintiffs' claim is not "premised" on any alleged trading in the forum and is indistinguishable from the claims in *Schwab* for which jurisdiction was found lacking.  *Schwab*, 883 F.3d at 83.  In other words, like the claims the Second Circuit rejected in *Schwab*, the alleged in-forum "transactions did not cause Defendants' false LIBOR submissions" to IBA in London or otherwise give rise to Plaintiffs' claim.  *Id.* at 84; *see also Prime International Trading, Ltd.*, 2019 WL 4071872, at *3.  Plaintiffs' antitrust claim must, therefore, be dismissed for lack of personal jurisdiction.

---

[11] *See also In re Platinum & Palladium Antitrust Litig.*, 2017 WL 1169626, at *42, *44 (S.D.N.Y. Mar. 28, 2017) (Woods, J.); *Sullivan* v. *Barclays PLC*, 2017 WL 685570, at *43-45 (S.D.N.Y. Feb. 21, 2017) (Castel, J.); *In re LIBOR-Based Fin. Instruments Antitrust Litig.* ("*LIBOR IV*"), 2015 WL 6243526, at *20 (S.D.N.Y. Oct. 20, 2015) (Buchwald, J.); *7 W. 57th St. Realty Co.* v. *Citigroup, Inc. LLC*, 2015 WL 1514539, at *10-11 (S.D.N.Y. Mar. 31, 2015) (Gardephe, J.).

## A.  Any Alleged Wrongful Conduct Occurred Outside the United States

At all relevant times, USD ICE LIBOR was administered by IBA, a company incorporated under the laws of England and Wales operating from its registered office in London, and set by IBA from London based on submissions made entirely from panel bank personnel outside the United States, primarily in London.  Accordingly, the alleged suppression of USD ICE LIBOR, which is the crux of Plaintiffs' claim, would have occurred entirely outside the United States. Foreign Defendants' declarations confirm the location from which submissions were determined and made, and the Complaint contains no well-pled allegations to the contrary.  Plaintiffs' legal conclusions couched as factual allegations and argumentative inferences cannot establish personal jurisdiction.  *Jazini*, 148 F.3d at 185; *see also In re Terrorist Attacks*, 714 F.3d at 673; *Robinson*, 21 F.3d at 507; *Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

### 1.  USD ICE LIBOR Submissions Were Determined and Submitted Outside the United States

The Panel Bank Defendants' USD ICE LIBOR submissions were all made ***outside*** the United States.  Plaintiffs strategically omit from the Complaint any factual account of the rate-setting process and instead state summarily that Panel Bank Defendants' USD ICE LIBOR submissions "were determined and submitted to ICE from within the United States" (CAC ¶ 340). The Complaint contains no factual support for this conclusory assertion—and no specifics as to any individual Defendant—and other allegations in the Complaint belie Plaintiffs' conclusory assertion.  For example, the ICE website, upon which the Complaint extensively relies, specifies that "Panel Composition" for the USD ICE LIBOR panel consists of the London branches of most

panel banks, including all three domestic banks.[12]  And Foreign Defendants' declarations confirm

that their submissions were universally determined and submitted from outside the United States.

*See supra* n.9.

The Complaint's generalized allegations that "the ICE LIBOR Code of Conduct placed

responsibility for USD ICE LIBOR submissions with the Panel Bank Defendants' respective U.S.

dollar funding desks" (CAC ¶ 59; *see also* CAC ¶ 562), and that Foreign Defendants maintained

their funding desks in New York (CAC ¶¶ 125, 136, 151, 163, 187, 197, 213, 235, 243, 255, 268,

and 562), are equally unsupported.  The Complaint cites no statements in the various iterations of

the ICE LIBOR Code of Conduct that even nominally support Plaintiffs' assertion that Foreign

Defendants' U.S. Dollar funding desks located in the United States were the desks responsible for

setting USD ICE LIBOR, and a review of those documents confirms that the Code of Conduct has

never said any such thing.[13]

---

[12] *See* ICE, *LIBOR*, https://www.theice.com/iba/libor (listing as contributors to USD ICE LIBOR "Bank of America N.A., (London Branch)," "Citibank N.A. (London Branch)," and JPMorgan Chase Bank, N.A. (London Branch)." The Complaint also concedes that Defendants' daily USD ICE LIBOR submissions were due between 11:05 AM and 11:39:59 AM, London time (CAC ¶ 371), which would have required a New York-located employee to make such submissions at 6:00 or 7:00 AM; that is an implausible scenario.  *See In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 2016 WL 7378980, at *10 (S.D.N.Y. Dec. 20, 2016) ("*LIBOR VT*") ("Furthermore, it is implausible that Thomson Reuters in New York would be in the role of accepting LIBOR submissions at around 11:00 a.m. London time (6:00 or 7:00 a.m. New York time).").

[13] *See* ICE, *ICE LIBOR Code of Conduct* (Issue 2) (Feb. 3, 2014), https://www.theice.com/publicdocs/171205_LIBOR_Code_of_Conduct_Issue_2.pdf; ICE, *ICE LIBOR Code of Conduct* (Issue 3) ((tbd) 2016), https://www.theice.com/publicdocs/ICE_LIBOR_CODE_OF_CONDUCT_CONTRIBUTING_BANKS_20160629.pdf; ICE, *ICE LIBOR Code of Conduct* (Issue 4) (Mar. 17, 2017), https://www.theice.com/publicdocs/IBA_Code_of_Conduct_Issue_4_From_17_March_2017.pdf; ICE, *ICE LIBOR Code of Conduct* (Issue 5) (June 18, 2018), https://www.theice.com/publicdocs/ICE_LIBOR_Code_of_Conduct.pdf; ICE, *ICE LIBOR Code of Conduct* (Issue 6) (Feb. 9, 2019), ICE, *ICE LIBOR Code of Conduct* (Issue 2) (Feb. 3, 2014), https://www.theice.com/publicdocs/171205_LIBOR_Code_of_Conduct_Issue_2.pdf; ICE, *ICE LIBOR Code of Conduct* (Issue 6) (July 24, 2019).  As this Court has previously explained, "'[i]n deciding a motion to dismiss for lack of personal jurisdiction, the court may consider factual issues beyond the pleadings,' including documents referenced in the complaint."  *In re Terrorist Attacks on Sept. 11, 2001,* 295 F. Supp. 3d 416, 431, n.15 (S.D.N.Y. Mar. 2018) (Daniels, J.); *see, e.g.,* CAC ¶ 14, n.8, ¶ 371, n.131.

2.      *USD ICE LIBOR Was Administered and Set from London*

Plaintiffs admit that USD ICE LIBOR is administered by IBA (CAC ¶ 95) and that IBA is a U.K. company with its principal place of business in London (CAC ¶ 90).  IBA's declaration confirms that the entire process of receiving submissions and calculating and publishing the rates is automated and overseen by operations personnel in London; manual interventions, where necessary are undertaken by IBA operations personnel in London as well.[14]

The Complaint does not contain any well-pleaded facts to the contrary.  While the Complaint states that "although IBA in London is the nominal administrator, ICE LIBOR was calculated in Atlanta during the Class Period," "IBA's data infrastructure resides in the ICE U.S. data centers in Atlanta, California, Chicago, and New York," and "[e]ach business day, ICE transmitted all of the ICE LIBOR contributor panel banks' individual USD ICE LIBOR submissions and the final averaged ICE LIBOR rates to data centers for worldwide publication, including one such data center in Atlanta" (CAC ¶¶ 95, 341, 352), these allegations lack any factual basis.

In supposed support of their assertions, Plaintiffs rely primarily on the fact that (i) IBA's parent company, ICE, is headquartered in Atlanta, Georgia; (ii) the parent company has a data center in Atlanta (and in other U.S. locations); and (iii) IBA includes on its website a list of contact numbers that include U.S. phone numbers.  CAC ¶¶ 95-96, 352; *see also* Declaration of S. Tselikas ¶ 17.  At most, these alleged facts demonstrate that IBA is a subsidiary of an international company that maintains data storage servers in the U.S., not that IBA's administration and calculation of USD ICE LIBOR occurred in the United States.

Moreover, the location of website servers is not enough to establish personal jurisdiction.

---

[14] Declaration of S. Tselikas ¶¶ 13, 15.

*Alibaba Grp. Holding Ltd.* v. *Alibabacoin Found.*, 2018 WL 2022626, at *5 (S.D.N.Y. Apr. 30, 2018) ("[T]he use of New York servers by defendant's web hosting vendor is 'merely coincidental,' and 'of no relevance to the facts or legal issues underlying this suit,' which concern the content of the website, not its architecture."); *see also BGDG Enters., LLC* v. *Barley & Swine*, 2014 WL 12479650, at *4 (W.D. Tex. Jan. 23, 2014) (noting that no court has held that facts about "the servers hosting . . . websites and these servers' physical locations" were relevant to personal jurisdiction analysis); *Marcus Uppe, Inc.* v. *Global Computer Enterprises, Inc.*, 2014 WL 6775282, at *2-3 (W.D. Pa. Dec. 2, 2014) (declining to find personal jurisdiction based on the nationwide use of defendant's "pervasive cloud computing" services). Likewise, IBA's publication of USD LIBOR on its website, and making it globally available, is insufficient as a matter of law to establish personal jurisdiction. *Alibaba*, 2018 WL 2022626, at *4; *see also Royalty Network Inc.* v. *Dishant.com, LLC*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009) (passive websites "[do] not without more justify the exercise of jurisdiction over the defendant"). Nor can Plaintiffs rely upon allegations that IBA transmitted data to the United States or has certain U.S.-based phone numbers. Such contacts are instead the sort of "random, fortuitous, or attenuated contacts" that cannot establish jurisdiction. *Walden*, 134 S. Ct. at 1123; *see also Waldman*, 835 F.3d at 337. Numerous courts in similar benchmark cases have rejected these types of allegations as insufficient to establish jurisdiction.[15] *LIBOR VI*, 2016 WL 7378980, at *10 ("[A]n allegation

---

[15] Plaintiffs' related allegations that Foreign Defendants published USD ICE LIBOR on Bloomberg and other financial services using U.S. wires (CAC ¶ 352) fail for the same reason. *Laydon*, 2015 WL 1515358, at *3 ("Communications that passed through and/or were stored within the United States are insufficient to assert personal jurisdiction over a defendant."); *FrontPoint Asian Event Driven Fund, L.P.*, v. *Citibank, N.A.*, 2017 WL 3600425, at *7 (S.D.N.Y. Aug. 18, 2017) ("*SIBOR I*") (holding that Plaintiffs' allegations about purposeful direction based on alleged submission of false interest rates to Thomson Reuters with knowledge that Thomson Reuters would publish those rates throughout the United States were insufficient to confer jurisdiction); *CDOR*, 368 F. Supp. 3d 681, 700 (similar). Similarly, courts in this circuit have held that allegations that the BBA (the former LIBOR administrator) published LIBOR in the U.S. were insufficient to allege personal jurisdiction against the BBA because Plaintiffs failed to allege that: (1) the BBA evaluated the accuracy of the panel bank's submissions in the U.S., (2) BBA employees in the U.S. made the decision to publish allegedly false data, (3) the BBA calculated LIBOR in the U.S., or (4) the BBA's distribution

that the submissions were sent to New York, without additional allegations that any person or entity did anything further with the submissions in the United States, is insufficient to support personal jurisdiction."); *see also Laydon*, 2015 WL 1515358, at *3.

> 3.  *Meetings Attended by Certain Foreign Defendants and Regulators in the United States Cannot Establish Personal Jurisdiction*

Stretching for a basis to claim that Foreign Defendants engaged in any alleged conspiratorial conduct in the United States, Plaintiffs allege that certain employees of some of the Foreign Defendants or their affiliates attended ARRC meetings in the United States. CAC ¶¶ 53, 339, 343, 505, 515-50. As a threshold matter, Plaintiffs acknowledge that several Foreign Defendants[16] were not members of ARRC and Plaintiffs do not allege that those Foreign Defendants attended any ARRC meetings. CAC ¶ 505. In any event, Plaintiffs fail to allege any specific conduct that allegedly occurred at these meetings in furtherance of the alleged conspiracy. *See* Merits Br. I.A.1. That is unsurprising, given that the ARRC meetings also included representatives from a host of U.S.-based regulators, including the Commodity Futures Trading Commission (which had previously investigated BBA LIBOR), and were sponsored by the Federal Reserve to develop operational recommendations for markets seeking to transition from LIBOR to an alternative benchmark rate.[17] CAC ¶¶ 53, 343. The Complaint fails to set forth any plausible

---

of LIBOR in the U.S. was a but-for—let alone a proximate—cause of Plaintiffs' alleged injuries. *LIBOR IV*, 2015 WL 6243526, at *38. Such allegations are similarly lacking against IBA here.

[16] These Foreign Defendants are: Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, Lloyds Bank plc, MUFG Bank, Ltd. and Mitsubishi UFJ Financial Group Inc., Norinchukin, Rabobank, Royal Bank of Canada, and Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui Financial Group Inc., and SMBC Capital Markets, Inc. For other Foreign Defendants, Plaintiffs broadly allege that Defendants' corporate families were members of ARRC and attended ARRC meetings, without identifying any specific entity as a member.

[17] *See, e.g.*, Alternative Reference Rates Committee (ARRC) Minutes for the March 22, 2018 Meeting, https://www.newyorkfed.org/medialibrary/microsites/arrc/files/2018/ARRC-Minutes-for-March-22-2018.pdf; Alternative Reference Rates Committee (ARRC) Minutes for the February 22, 2017 Meeting, https://www.newyorkfed.org/medialibrary/microsites/arrc/files/2017/ARRC-Feb-22-2017-meeting-minutes.pdf; Alternative Reference Rates Committee (ARRC) Minutes for the February 25, 2016 Meeting, https://www.newyorkfed.org/medialibrary/microsites/arrc/files/2016/Feb-25-2016-ARRC-Minutes.pdf; Alternative

theory under which Foreign Defendants could or would further an alleged conspiracy to manipulate a benchmark—one which, as Plaintiffs acknowledge, has been the subject of extensive regulatory scrutiny (CAC ¶¶ 516, 588)—during meetings with the very regulators charged with that scrutinizing and which were also attended by absent members of Plaintiffs' proposed class. *See* Merits Br. I.A.1.  Because the ARRC meetings are not plausibly alleged to be part of the conspiracy, they are not suit-related and cannot provide a basis for personal jurisdiction.

### B.      Plaintiffs' Purposeful Availment Theory Fails

Unable to allege suit-related conduct in the United States, Plaintiffs resort to an alternative argument that Foreign Defendants are subject to personal jurisdiction on a purposeful availment theory because they (or their affiliates or subsidiaries) purportedly marketed and sold USD ICE LIBOR Financial Instruments in the United States.  CAC ¶ 327.  But Plaintiffs fail to allege, as they must under *Schwab*, that these trading activities *caused* the alleged manipulation of USD ICE LIBOR.  Such allegations cannot, therefore, establish jurisdiction.

*First*, Plaintiffs' theory does not apply at all to most Foreign Defendants.  Some never traded USD ICE LIBOR Financial Instruments with any U.S. counterparties, including Plaintiffs.[18] Plaintiffs' transaction-based theory plainly cannot support jurisdiction over Foreign Defendants that did not even trade these instruments in the United States.  *See Schwab*, 883 F.3d at 86-88 (affirming dismissal of defendants that did not trade with plaintiffs).

The same is true of other Foreign Defendants that are not alleged to have traded USD ICE

---

Reference Rates Committee (ARRC) Minutes for the February 19, 2015 Meeting, https://www.newyorkfed.org/medialibrary/microsites/arrc/files/2015/Feb-19-ARRC-Minutes.pdf; Alternative Reference Rates Committee (ARRC) Minutes for the December 12, 2014 Meeting, https://www.newyorkfed.org/medialibrary/microsites/arrc/files/2014/Dec-12-2014-ARRC-Minutes.pdf.

[18] These Foreign Defendants include:  Credit Suisse Group AG, HSBC Holdings plc, Mitsubishi UFJ Financial Group Inc., Sumitomo Mitsui Banking Corporation Europe, Ltd., UBS Group AG, and IBA.

LIBOR Financial Instruments with any named Plaintiff, but only with absent class members.[19]   *See* CAC ¶¶ 77-87.   Such hypothetical transactions with unnamed class members are not jurisdictionally relevant and cannot establish jurisdiction.   *See, e.g.*, *Sullivan* v. *Barclays PLC*, 2017 WL 685570, at *44 (S.D.N.Y. Feb. 21, 2017) ("Some of UBS's counterparties were located in the United States, including [plaintiffs].   But the presence of U.S. victims alone does not make out jurisdiction . . . ."); *Beach* v. *Citigroup Alternative Investments LLC*, 2014 WL 904650, at *6 (S.D.N.Y. Mar. 7, 2014) ("Contacts with unnamed class members may not be used as a jurisdictional basis[.]").

Moreover, for a number of Defendants, Plaintiffs broadly allege that they transacted with Defendants' corporate families, but fail to specify with which Defendant entity Plaintiffs allegedly transacted.[20]   Such non-particularized allegations are jurisdictionally deficient.   *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (due process demands that courts assess "[e]ach defendant's contacts ... individually").   As explained by the Second Circuit in *Schwab*, each "of those 'Defendants' is actually two distinct Defendants—a parent and a wholly owned subsidiary—that the complaint collapses into one." 883 F.3d at 84.   Because Plaintiffs refer only to the grouped entities, it is, like in *Schwab*, "impossible to determine whether both Defendants in each pairing sold directly to [Plaintiffs] and, if not, whether the Defendant that did not make direct sales should be considered an indirect seller or non-seller (or whether it belongs in this lawsuit at all)." *Id.*   As to those Defendants, the Complaint fails to make a *prima facie* case for personal

---

[19] These Foreign Defendants are: BNP Paribas, Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, Credit Suisse Group AG, Credit Suisse AG, Deutsche Bank AG, Lloyds Bank plc, MUFG Bank, Ltd., Mitsubishi UFJ Financial Group Inc., The Norinchukin Bank, Rabobank, The Royal Bank of Scotland Group plc, National Westminster Bank Plc, NatWest Markets Plc, Société Générale, Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui Financial Group, Inc.

[20] These Foreign Defendants are: Barclays, HSBC, Royal Bank of Canada, and UBS.   *See* CAC ¶¶ 81, 85, 142, 144, 204, 206, 261, 263, 312, 314.

jurisdiction. *Id.*

*Second*, even as to Foreign Defendants alleged to have transacted directly with Plaintiffs, such trading activities are not jurisdictionally relevant because Plaintiffs fail to plausibly allege that any Foreign Defendant participated in any conspiracy, let alone a profit-motivated one. *See* Merits Br. at I; *CDOR*, 368 F. Supp. 3d at 699-700 ("Plaintiff has failed to plausibly allege a profit-motivated conspiracy and, therefore, the sales of CDOR-Based Derivatives in the United States do not constitute 'suit-related contacts' which establish the basis for personal jurisdiction under the purposeful availment theory.").

*Third*, even if Plaintiffs had plausibly alleged that a Foreign Defendant both participated in an alleged for-profit conspiracy to manipulate USD ICE LIBOR and traded USD ICE LIBOR Financial Instruments with a named Plaintiff, Plaintiffs still would fail to establish the requisite causal connection, required by *Schwab* under the purposeful availment theory, between the suit-related alleged conduct (i.e., the supposed manipulation of USD ICE LIBOR abroad) and Foreign Defendants' alleged U.S.-based trading activities.  Specifically, in *Schwab*, the Second Circuit rejected plaintiffs' theory that the trading of billions of dollars of USD BBA LIBOR-based instruments in the forum could establish personal jurisdiction over claims based on the alleged manipulation of USD BBA LIBOR.  883 F.3d at 84.  It did so because plaintiffs had failed to plausibly allege that those sales were causally connected to the alleged overseas conspiracy.  *Id.* Many district courts in this Circuit have reached the same conclusion based on jurisdictional allegations that are indistinguishable from those alleged here.  *See, e.g.*, *BBSW*, 343 F. Supp. 3d at 205-06; *see also* cases cited *supra* 11, n.11.

Plaintiffs here advance the same theory of jurisdiction rejected by *Schwab* and its progeny. They argue that Foreign Defendants' alleged business activities in the United States—i.e.,

marketing and trading USD ICE LIBOR Financial Instruments or the distribution of USD ICE LIBOR—confer jurisdiction over a claim involving the alleged manipulation of USD ICE LIBOR. But, as in *Schwab*, the Complaint fails to plausibly allege a causal connection between the two. Instead, Plaintiffs allege that, given the size of the market in the United States for USD ICE LIBOR Financial Instruments, it was foreseeable that Foreign Defendants' alleged manipulation would impact the trading of USD ICE LIBOR in the United States.  CAC ¶ 326.  As in *Schwab*, however, that Plaintiffs assert their claim collectively and indiscriminately against all Defendants—regardless of whether they actually engaged in such trading activities—"only bolsters [the] conclusion" that the alleged activities in the United States are unrelated to the alleged conspiracy to manipulate USD ICE LIBOR.  883 F.3d at 84.

While Plaintiffs attempt to distinguish this case from *Schwab* by claiming that the "suppression" conspiracy alleged here is purportedly "for-profit," whereas the "suppression" conspiracy alleged in *Schwab* was based on preserving the banks' reputation, they ignore that *Schwab* also involved—and rejected as jurisdictionally irrelevant—similar allegations that the suppression of USD LIBOR would benefit defendants' trading positions.  883 F.3d at 78 (addressing allegations that the alleged suppression of LIBOR "had the immediate effect of lowering Defendants' interest payment obligations on financial instruments tied to LIBOR").

Like in *Schwab*, the Complaint here states that Foreign Defendants profited from the alleged conspiracy through their trading positions in the United States (*see, e.g.*, CAC ¶ 347), but there are no factual allegations to support an assertion that Foreign Defendants coordinated their alleged overseas manipulation with their alleged U.S.-based trading positions (or those of their subsidiaries and affiliates).  That is, Plaintiffs fail to allege facts supporting their tortured logic that Foreign Defendants' funding desks supposedly were net payers of USD ICE LIBOR for an almost

six-year period, and somehow orchestrated the U.S.-trading positions of other parts of the panel banks or of the banks' affiliates or subsidiaries, in such a way as to purportedly benefit from suppressed submissions. The absence of supporting allegations for such an attenuated theory is the reason that Judge Kaplan held that *Schwab* "controls" and precludes the exercise of jurisdiction even in the context of an alleged for-profit conspiracy to manipulate a benchmark. *BBSW*, 343 F. Supp. 3d at 205 (the conspiracy addressed in *Schwab* was "motivated in part by financial incentives"); *see also CDOR*, 368 F. Supp. 3d at 697-700 (rejecting a nearly identical set of allegations about a "for profit" persistent suppression conspiracy as implausible: "Plaintiff has failed to plausibly allege a profit-motivated conspiracy and, therefore, the sale of CDOR-Based Derivatives in the United States do not constitute 'suit-related contacts' which establish the basis for personal jurisdiction under the purposeful availment theory"); *Laydon* v. *Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 2017 WL 1113080, at *5 (S.D.N.Y. Mar. 10, 2017) (Daniels, J.) ("The fact that some of Lloyds' counterparties in derivatives transactions . . . were located in the United States is insufficient to establish minimum contacts with the United States.").

### C.   Plaintiffs' Causal Effects Theory Fails

Plaintiffs' causal effects theory fails for substantially the same reasons as their purposeful availment theory. Under the causal effects test, suit-related conduct occurring outside the forum that causes effects in the forum may support jurisdiction if, and only if, the plaintiff plausibly alleges that "the defendant expressly aimed its conduct at the forum." *Schwab*, 883 F.3d at 87. While the Complaint conclusorily states that Foreign Defendants' alleged "misconduct was purposefully directed at the United States" (*see, e.g.*, CAC ¶ 327), the Complaint lacks the factual allegations required to support jurisdiction. *Jazini*, 148 F.3d at 185; *In re Terrorist Attacks*, 714 F.3d at 673.

Plaintiffs claim that the United States was a significant market for USD ICE LIBOR Financial Instruments (CAC ¶ 336) such that Foreign Defendants' alleged manipulation of USD ICE LIBOR would have been felt in the United States. But the Complaint itself makes clear that any impact in the United States was incidental and that the same alleged impact would have occurred in markets across the globe. CAC ¶ 9 ("Since February 1, 2014, USD ICE LIBOR has been 'the world's most widely used benchmark for short term bank borrowing rates.'"). Because the United States was not the "focal point" of the alleged misconduct or the "nucleus" of the alleged harm, *Waldman*, 835 F.3d at 340, this Court does not have jurisdiction under the effects test. *See also Sullivan*, 2017 WL 685570, at *44 (dismissing Euribor manipulation claims where plaintiffs failed to sufficiently plead that "the existence, causation or intent to manipulate the Euribor on the part of [defendant] had its 'nucleus' or 'focal point' in the United States"); *In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *42 ("The forum must be the 'focal point' or 'nucleus' of plaintiff's alleged harm.").

At bottom, Plaintiffs merely allege that it was foreseeable that they would be harmed in the United States, *not* that the conduct was directly aimed at the United States. As the Supreme Court explained in *Walden*, foreseeable harm in the forum alone is insufficient to support jurisdiction, as it does not demonstrate that Foreign Defendants' own "conduct connects [them] to the forum" in a "meaningful way." 134 S. Ct. at 1125. Courts in similar cases have routinely rejected attempts to premise personal jurisdiction based on allegations of foreseeable harm in the forum.[21] This

---

[21] *See, e.g.*, *Laydon*, 2015 WL 1515358, at *2 ("[F]oreseeability is not the standard for recognizing personal jurisdiction; the actions must instead be 'expressly aimed'" at the forum); *Sullivan*, 2017 WL 685570, at *45 (Castel, J.) (dismissing Euribor manipulation claims where plaintiffs failed to sufficiently plead that "the existence, causation or intent to manipulate the Euribor on the part of [defendant] had its 'nucleus' or 'focal point' in the United States); *7 West 57th Street Realty Co.*, 2015 WL 1514539, at *11 (Gardephe, J.) (dismissing USD BBA LIBOR manipulation claims because "the fact that harm [from alleged USD BBA LIBOR manipulation] in [New York] is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant"); *BBSW*, 343 F. Supp. 3d at 207 (Kaplan, J.) ("That plaintiffs and the purported class members were in the United States and suffered from

Court should do the same.

## II. PLAINTIFFS FAIL TO ESTABLISH JURISDICTION BASED ON THE CONTACTS OF FOREIGN DEFENDANTS' ALLEGED AGENTS AND CO-CONSPIRATORS

Plaintiffs cannot establish jurisdiction over Foreign Defendants using allegations relating to Foreign Defendants' alleged agents and co-conspirators. Personal jurisdiction must be established based on each defendant's own contacts with the forum state and not based on the contacts of other parties. *See Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408, 417 (1984) ("[U]nilateral activity of another party or a third person is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction."); *Rush* v. *Savchuk*, 444 U.S. 320, 332 (1980). *Walden* crystallized these principles and emphasized that personal jurisdiction must be based upon "contacts that the defendant *himself* creates with the forum State," and cannot be based on "contacts he makes by interacting with other persons affiliated with the State." 134 S. Ct. 1122-23.

### A. Plaintiffs' Agency Allegations Fail to Establish Personal Jurisdiction

Plaintiffs' attempt to base specific jurisdiction on the in-forum contacts of Foreign Defendants' affiliates and subsidiaries fails. As *Schwab* made clear, Plaintiffs cannot treat affiliated entities as a single defendant to establish jurisdiction. *Schwab*, 883 F.3d at 84 ("Because Schwab refers to only the grouped entities throughout its complaint, it is impossible to determine whether both Defendants in each pairing sold directly to Schwab and, if not, whether the Defendant

---

diminished returns on their BBSW-Based Derivatives transactions does not serve to connect the Foreign Defendants to the United States for jurisdictional purposes. There are no allegations that the Foreign Defendants expressly aimed their conduct at the forum – just that they expressly aimed their conduct at counterparties to BBSW-Based Derivative transactions around the world, some of whom happened to be in the United States.").

that did not make direct sales should be considered an indirect seller or non-seller (or whether it belongs in this lawsuit at all).").  Plaintiffs' Complaint suffers from the same defects.  It repeatedly refers to corporate families collectively (*see, e.g.*, CAC ¶¶ 93, 109, 119, 129, 142, 156, 169, 180, 192, 204, 218, 229, 261, 275, 286, 300, 312), and thus makes it impossible to determine which specific Defendant is the subject of a particular allegation (*see, e.g.*, CAC ¶¶ 346, 348, 356-59). This alone is grounds for dismissal.  *Schwab*, 883 F.3d at 84.

Further, the Complaint repeats the same generic allegation that each Defendant, along with its affiliates, "shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the alleged conspiracy."  CAC ¶¶ 95, 110, 120, 130, 143, 157, 170, 181, 193, 205, 219, 230, 262, 276, 287, 301, 313.  Plaintiffs also allege that IBA "is an alter ego and mere department of Intercontinental Exchange Inc." and that it is controlled by U.S. affiliates.  CAC ¶¶ 98-105, 341.  But these are legal conclusions, not factual allegations, and thus cannot plausibly allege an agency relationship between any Defendant and its affiliates.  *See Jazini*, 148 F.3d at 184 (for parent-subsidiary agency, "the plaintiff must show that the subsidiary does all the business which [the parent corporation] could do were it here by its own officials") (alteration in original); *In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227, 234-35 (S.D.N.Y. 2015) ("*Daimler* has foreclosed the establishment of jurisdiction [through agency] based only on generalized facts[.]").  As *Schwab* holds, plaintiffs' "bare allegation[s]" of an agency relationship, including "sparse" claims that certain Defendants "controlled or otherwise directed or materially participated in the operations" of their U.S.-based affiliates and "reaped proceeds or other financial benefits" from the instruments they sold, cannot confer jurisdiction.  883 F.3d at 86; *see Jazini*, 148 F.3d at 185 (plaintiffs cannot substitute "legal conclusion[s] couched as a factual allegation" for the "factual specificity necessary to confer jurisdiction").

25

Because none of Plaintiffs' allegations plausibly establishes that any Foreign Defendant "exert[ed] pervasive control" over its affiliates as to the alleged conduct at issue, as established law requires, Plaintiffs do not satisfy the requirements for pleading agency. *Wilder* v. *News Corp.*, 2015 WL 5853763, at *6 (S.D.N.Y. Oct. 7, 2015); *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.,* 2015 WL 6696407, at *21 (S.D.N.Y. Nov. 3, 2015) ("*LIBOR V*") (plaintiffs must plead that the parent "directed the specific activities that allegedly violated [the] law").

Plaintiffs' "alter ego" allegations against IBA are a last-ditch effort to turn ordinary business conduct into a hook that would essentially give the U.S. global jurisdiction over the foreign subsidiaries of U.S. companies. CAC ¶¶ 98-105. Courts have time and again rejected this theory and imposed a high standard for piercing the corporate veil, which Plaintiffs fail to meet. To determine whether the subsidiary is an "alter ego" of the parent corporation, courts from this circuit have considered: (1) "common ownership"; (2) "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies exercised by the parent." *In re Lyondell Chem. Co.*, 543 B.R. 127, 143-44 (Bankr. S.D.N.Y. 2016) (citing *Volkswagenwerk Aktiengesellschaft* v. *Beech Aircraft Corp.*, 751 F.2d 117, 120–22 (2d Cir. 1984)). Courts have recognized that "[t]he existence of common directors and officers is a normal business practice of a multi-national corporation," and that a showing of mere corporate ownership or common management, which is all Plaintiffs ultimately allege here, is not sufficient to justify veil-piercing. *Mayatextil, S.A.* v. *Liztex U.S.A., Inc.*, 1995 WL 131774, at *6 (S.D.N.Y. Mar. 23, 1995); *see also De Castro* v. *Sanifill, Inc.*, 198 F.3d 282, 283 (1st Cir. 1999); *Harris Rutsky & Co. Ins. Servs., Inc.* v. *Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). Plaintiffs do not and cannot point

to a single allegation that IBA is financially dependent on the other ICE defendants, that it fails to observe corporate formalities, or that the other ICE defendants control the operations and operational policies of IBA.[22]   Indeed, the evidence of record shows the opposite is true.[23]

### B.     Plaintiffs' Conspiracy Jurisdiction Allegations Fail

Plaintiffs' conclusory conspiracy allegations are not sufficient to establish conspiracy jurisdiction.   To state a *prima facie* case of conspiracy jurisdiction, Plaintiffs must allege, at a minimum, "that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state."  *Schwab*, 883 F.3d at 87.  Plaintiffs fail to meet this standard because they do not plausibly allege the existence of a conspiracy to manipulate USD ICE LIBOR, *see* Merits Br. at Part I.A, the participation by any Foreign Defendants in such an alleged conspiracy, or any suit-related conduct in or directed at the forum, *see supra* at Part I.

Plaintiffs' conspiracy jurisdiction allegations also fail to comport with due process and the applicable jurisdictional statutes because the Complaint lacks the requisite allegations of an agency-like relationship between any Defendant and its alleged co-conspirators.

### 1.     To Comport with Due Process, Personal Jurisdiction Must Be Based on a Defendant's Efforts to Connect Itself to the Forum

Following the Supreme Court's decision in *Walden*, courts have rejected vicarious conspiracy jurisdiction—a theory of personal jurisdiction whereby a foreign defendant can be haled into a jurisdiction based only on contacts of an alleged co-conspirator—as inconsistent with due process.  *See In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d at 227 ("The rules

---

[22] If linked websites or similar logos or corporate insignia were sufficient to pierce the corporate veil, as Plaintiffs allege, just about every multinational corporation would be subject to veil-piercing.  *See* CAC ¶¶ 103, 104.

[23] Declaration of S. Tselikas ¶¶ 11, 18-20.

and doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine.").  The standalone theory of conspiracy jurisdiction fails to comport with due process because jurisdiction must be based upon "contacts that the 'defendant himself' creates with the forum State," not with third-party contacts. *Walden*, 134 S. Ct. at 1122.  For this reason, "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  *Id*. at 1123; *see also Keeton* v. *Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) (jurisdiction must be based upon "[e]ach defendant's contacts with the forum State" which "must be assessed individually").

Consistent with traditional agency principles, longstanding Second Circuit precedent requires that, for a co-conspirator's conduct to be imputed to a defendant for jurisdictional purposes, a plaintiff must allege that the defendant directed and controlled the agent's in-forum tortious conduct, knew of those contacts, and benefited from them.  *Leasco Data Processing Equipment Corp.* v. *Maxwell*, 468 F.2d 1326, 1341 n.11, 1343 (2d Cir. 1972) (abrogated on other grounds by *Morrison* v. *National Australia Bank, Ltd.*, 561 U.S. 247 (2010)); *see also In re Shulman Transport Enterprises, Inc.*, 744 F.2d 293, 295 (2d Cir. 1984).  In *Leasco*, the plaintiffs alleged a defendant, a London-based attorney and director of the publisher, Isidore Kerman, had conspired to fraudulently induce them to invest in a publishing company, including through misrepresentations alleged to have been made at a meeting in New York between the owner of the publisher, Robert Maxwell, and Kerman's New York-based law partner, Paul DiBiase.  468 F.2d at 1330.  Plaintiffs, attempting to establish personal jurisdiction over Kerman, argued that the contacts of his partner, DiBiase, should be attributed to Kerman (notwithstanding that he was not in attendance at the New York meeting), as he was alleged to have been aware of the attempted inducement to invest.  *Id.* at 1343.

28

Rejecting this theory, the court held that "the rule in this circuit is that the mere presence of one conspirator, such as Maxwell, does not confer personal jurisdiction over another alleged conspirator." *Id.* The court then also rejected plaintiffs' request that the court find jurisdiction based on the partnership relationship between Kerman and DiBiase, while noting that the result might have differed if "the relationship was the closer one between a senior partner, especially one who is a director of the client, and a younger partner to whom he has delegated the duty of carrying out an assignment over which the senior retains general supervision." *Id.* In drawing this distinction, the Second Circuit imposed a requirement of direction, control, and supervision for the imputation of an in-forum actor's contacts, which aligns with *Walden*'s requirement that jurisdiction must be based on contacts that "the defendant himself creates with the forum." 134 S. Ct. at 1122.

The Second Circuit's decision in *Schwab* does not (and indeed could not) disturb these principles. *Schwab*—like *Unspam Techs., Inc.* v. *Chernuk*, 716 F.3d 322 (4th Cir. 2013), the Fourth Circuit decision on which the Second Circuit relied in *Schwab*—had no occasion to reach the due process question since the plaintiffs had not stated a *prima facie* case for conspiracy jurisdiction without any plausibly alleged in-forum act in furtherance of the conspiracy in the forum. *See Schwab*, 883 F.3d at 87. There is no suggestion in *Schwab* that the Second Circuit could, intended to, or did reach and reject these agency principles. To do so would have required the *Schwab* panel to overrule decades of Second Circuit precedent, including *Leasco* (which the court cited favorably elsewhere in its opinion), which is done only rarely. *See Union of Needletrades, Indus. and Textile Emps., AFL-CIO, CLC* v. *U.S. I.N.S.*, 336 F.3d 200, 210 (2d Cir. 2003) ("[A]s a general rule, one panel of this Court cannot overrule a prior decision of another panel.").

29

Without plausible allegations of direction and control, the alleged co-conspirator's actions are the mere "unilateral activity of . . . a third person," insufficient to establish personal jurisdiction over the defendant. *Helicopteros*, 466 U.S. at 417. Here, there are no allegations that any Foreign Defendant directed or controlled the allegedly wrongful in-forum conduct of an alleged co-conspirator, even *assuming* Plaintiffs plausibly alleged any in-forum conduct sufficient to confer jurisdiction over that co-conspirator. Nor do Plaintiffs allege that any Foreign Defendant knew of and benefited from any such contacts. *See Contant* v. *Bank of America Corp.*, 385 F. Supp. 3d 284, 295 (S.D.N.Y. 2019) (personal jurisdiction over MUFG, RBS or SocGen lacking because complaint failed to plead facts showing they were aware of alleged co-conspirators' in-forum acts). Without such allegations, imputing an alleged co-conspirator's in-forum contacts to Foreign Defendants would violate the fundamental principles of due process.

2.    *Plaintiffs' Conspiracy Allegations Do Not Satisfy Any Applicable Jurisdictional Rule or Statute*

Plaintiffs' conspiracy allegations also fail to establish jurisdiction because they do not comport with New York's long-arm statute, which requires Plaintiffs to demonstrate that "(a) the defendant had an awareness of the effects in New York of [the co-conspirator's] activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted at the direction or under the control or at the request of or on behalf of the out-of-state defendant." *In re Terrorist Attacks*, 349 F. Supp. 2d 765, 805 (S.D.N.Y. 2005). Nor do the conspiracy allegations find support in Federal Rules of Civil Procedure 4(k)(1)(C) or 4(k)(2), neither of which recognizes vicarious conspiracy jurisdiction.[24]

---

[24] Even if Rule 4(k)(2) did recognize vicarious conspiracy jurisdiction, Plaintiffs have not satisfied the plain terms of the rule. For claims arising under federal law, Rule 4(k)(2) contemplates a potential basis for personal jurisdiction over a defendant only when "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2)(A). District courts within this circuit have imposed on plaintiffs the initial burden to certify that the defendants over which personal jurisdiction purportedly exists pursuant to Rule 4(k)(2) are not subject to

*See, e.g., In re Aluminum Warehousing Antitrust Litigation*, 90 F. Supp. 3d at 227.

## III.   DUE PROCESS REQUIRES PLAINTIFFS TO ESTABLISH JURISDICTION BASED ONLY ON FOREIGN DEFENDANTS' CONTACTS WITH NEW YORK

Because Plaintiffs have identified no jurisdictionally relevant contacts, this Court need not address whether the relevant forum for purposes of establishing jurisdiction is the United States or New York.  But were it to reach this issue, due process requires Plaintiffs to establish personal jurisdiction over Foreign Defendants based on their contacts with New York specifically and not based on their contacts with the United States as a whole.  *See* CAC ¶¶ 327-28.  While the Second Circuit has not yet resolved the question of whether a nationwide contacts approach can be used to establish jurisdiction under the Clayton Act, *see Gucci Am., Inc.* v. *Weixing Li*, 768 F.3d 122, 142 n.21 (2d Cir. 2014), the Supreme Court's decision in *Daimler* forecloses the application of a nationwide contacts analysis.  *Daimler AG* v. *Bauman, et al.*, 134 S. Ct. 746 (2014).  A nationwide contacts approach is inconsistent with the Supreme Court's focus in *Daimler* on due process as a matter of fundamental fairness and reasonableness to the defendant.  *Id.* at 761-62 (such "exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit").

## IV.   FOREIGN DEFENDANTS DID NOT CONSENT TO JURISDICTION IN NEW YORK

Plaintiffs further assert that Foreign Defendants are subject to personal jurisdiction in New York because they allegedly traded in USD ICE LIBOR-linked instruments governed by New

---

jurisdiction in any particular state forum. *See, e.g., 7 W. 57th St.*, 2015 WL 1514539, at *13; *Precision Assocs., Inc.* v. *Panalpina World Transp. (Holding) Ltd.*, 2011 WL 7053807, at *44 (E.D.N.Y. Jan. 4, 2011), *adopted by* 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012).  Plaintiffs have made no such certification here—and, in fact, allege that Foreign Defendants are subject to personal jurisdiction in New York—and therefore have failed to satisfy a prerequisite for personal jurisdiction under Rule 4(k)(2).

York choice of law provisions and forum selection clauses. *See, e.g.*, CAC ¶¶ 265; 344-46. This argument should be rejected because Plaintiffs fail to allege that they entered into any such agreements with any Foreign Defendant, let alone that any such agreement relates to the claim at issue here. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 4773129, at *2, *34 (S.D.N.Y. Sept. 12, 2016) (distinguishing between "claims brought against counterparties in their capacity as counterparties," which "relate to the ISDA agreements . . . because they depend upon the existence of a contractual relationship between the parties," and other claims—like Plaintiffs' antitrust claim here—that "do not depend upon the existence of a contractual relationship between the parties"); *Sullivan* v. *Barclays PLC*, 2017 WL 685570, at *39 (S.D.N.Y. Feb. 21, 2017) (application of agreements to jurisdictional analysis is "transaction specific" and does not support finding of jurisdiction where "plaintiffs have not alleged that their claims relate to the terms of a specific" agreement).

## V.   FOREIGN DEFENDANTS ARE NOT SUBJECT TO GENERAL JURISDICTION

The Complaint does not establish a basis for exercising general jurisdiction over any Foreign Defendant because it does not allege that any Foreign Defendant is "at home" in New York.[25] And Plaintiffs' theories that certain Foreign Defendants consented to general jurisdiction by registering with the New York State Department of Financial Services ("NYSDFS") or the Connecticut Department of Banking have been universally rejected by numerous judges in this circuit. This Court should do the same.

### A.   Foreign Defendants Are Not "At Home" in New York

In *Daimler,* the U.S. Supreme Court held that a defendant is subject to general jurisdiction

---

[25] The Complaint fails to specify whether Plaintiffs are attempting to establish personal jurisdiction over Foreign Defendants based on a theory that they are "at home" in New York.

in a forum "only when the corporation's affiliations with the State in which suit is brought are so constant and pervasive as to render [it] essentially at home in the forum State." *Daimler,* 134 S. Ct. at 751. For a corporation, "the place of incorporation and principal place of business are paradig[m] bases for general jurisdiction." *Id.* at 760. The Second Circuit has held that place of incorporation and principal place of business are the only two appropriate considerations for a general jurisdiction analysis "except in a truly 'exceptional' case." *Brown* v. *Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016).

As Plaintiffs admit (*see* CAC ¶¶ 76-359), no Foreign Defendant has its place of incorporation or principal place of business in New York. *See supra* n.25. Plaintiffs also allege no facts that would make this an "exceptional case." *See Daimler*, 134 S. Ct. at 761 n.19 (identifying as an example the complete relocation of a Philippine corporation's operations to Ohio during World War II). Plaintiffs fail to demonstrate, as they must, that any Foreign Defendant's contacts with New York would "shift the company's primary place of business (or place of incorporation) away from" its home country. *Sonera Holding B.V.* v. *Cukurova Holding A.S.*, 750 F.3d 221, 226 (2d Cir. 2014) (general jurisdiction would be inappropriate "[e]ven assuming [affiliates'] New York contacts should be imputed to [the defendant]"); *see also Brown*, 814 F.3d at 629.

Courts in this district have consistently refused to find general jurisdiction in New York as to foreign bank defendants, including many of the Foreign Defendants here. *See, e.g.*, *LIBOR IV*, 2015 WL 6243526, at *27 (finding no general jurisdiction over Barclays Bank PLC, Credit Suisse AG, and Deutsche Bank AG); *Matter of Fornaciari for Order to Take Discovery Pursuant to 28 U.S.C. § 1782,* 2018 WL 679884, at *2 (S.D.N.Y. Jan. 29, 2018); *Australia and New Zealand Banking Group Ltd.* v. *APR Energy Holding Ltd.*, 2017 WL 3841874, at *3-4 (S.D.N.Y. Sept. 1,

2017).  As in those cases, Plaintiffs here have failed to allege that any Foreign Defendant is "at home" in New York for purposes of general jurisdiction.

### B.  No Foreign Defendant Consented to General Jurisdiction in New York

Plaintiffs also do not establish general jurisdiction on the theory that certain Foreign Defendants[26] consented to general jurisdiction by registering their New York branches with the NYSDFS under New York Banking Law § 200-b.  CAC ¶ 356.  The Second Circuit has warned that if registration and appointment of an in-state agent—without an express consent to general jurisdiction—were enough, it would result in "*Daimler's* ruling [being] robbed of meaning by a back-door thief."  *Brown*, 814 F.3d at 640.  Courts in this district have repeatedly ruled that registration is not a sufficient basis for exercising general jurisdiction.  *See Motorola Credit Corp.* v. *Uzan,* 132 F. Supp. 3d 518, 521-22 (S.D.N.Y. 2015) (holding that "the banks did not consent to this Court's jurisdiction by registering or being licensed under New York Banking Law § 200 or federal law"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 1268267, at *2 (S.D.N.Y. Mar. 31, 2016) ("*Forex*") (holding that the "New York Court of Appeals has interpreted § 200-b to confer subject matter jurisdiction and not personal jurisdiction" and that the provision "contains nothing from which consent to jurisdiction might be implied"); *FrontPoint Asian Event Driven Fund, L.P.,* v. *Citibank, N.A.*, 2017 WL 3600425, at *5 (S.D.N.Y. Aug. 18, 2017) ("*SIBOR I*") ("Plaintiffs may not use New York's registration statute as a basis for asserting general

---

[26] These Foreign Defendants are: Barclays Bank PLC, BNP Paribas, Crédit Agricole Corporate and Investment Bank, Credit Suisse AG, Deutsche Bank AG, MUFG Bank, RBS.  Plaintiffs allege that certain other Foreign Defendants— Lloyds Bank plc, The Norinchukin Bank, Rabobank, Société Générale, and Sumitomo Mitsui Banking Corporation (*see,* CAC ¶¶ 217, 238, 246, 284, 298) are also licensed, supervised, and regulated by the NYSDFS, but do not claim that supervision involved a consent to jurisdiction.  To the extent Plaintiffs purport to allege that entire corporate families have consented to jurisdiction rather than specific entities, *see* CAC ¶¶ 356, 358 (alleging that grouped corporate families have consented to jurisdiction), such allegations are impermissibly group pled.  *Schwab*, 883 F.3d at 84.  And as to Lloyds Bank plc: the allegation is stale, because Lloyds Bank closed its New York branch and surrendered its license before any of the actions here were filed.  *See* Decl. of S. Dolmatch ¶ 6.

jurisdiction over Foreign Defendants."); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2016 WL 1558504, at *7 (S.D.N.Y. Apr. 15, 2016) ("[P]laintiffs['] conten[tion] that certain defendants consented to general jurisdiction in New York by registering with the New York State Department of Financial Services . . . flies in the face of the plain language of the statute.").  Accordingly, a Foreign Defendant's registration under N.Y. Banking Law § 200-b does not amount to their consenting to general jurisdiction.

Plaintiffs' consent theory also violates the Constitution.  As the Second Circuit held in *Gucci Am., Inc*. v. *Weixing Li*, the mere presence of a local branch in the forum does not subject that foreign bank to general jurisdiction.  768 F.3d at 135; *see also Motorola Credit Corp*., 132 F. Supp. 3d at 521 ("*Gucci* stands for the proposition that mere operation of a branch office in a forum—and satisfaction of any attendant licensing requirements—is not constitutionally sufficient to establish general jurisdiction.").  Plaintiffs' interpretation of the New York statute would violate the unconstitutional conditions doctrine by requiring Foreign Defendants to surrender their constitutional rights (i.e., the due process rights guaranteed under *Daimler* and *Gucci*) to receive a government benefit (i.e., the privilege of registering a bank in New York).  *See Koontz* v. *St. Johns River Water Mgmt. Dist*., 133 S. Ct. 2586, 2594 (2013).  It would also violate the Dormant Commerce Clause because a statute that "compels every foreign interstate carrier to submit to suit there as a condition of maintaining a soliciting agent within the state" would "impose[] upon interstate commerce a serious and unreasonable burden."  *Davis* v. *Farmers' Co-op. Equity Co.*, 262 U.S. 312, 315 (1923); *see also In re Syngenta AG MIR 162 Corn Litig.*, 2016 WL 2866166, at *6 (D. Kan. May 17, 2016) (consent-based registration statute was unconstitutional violation of Dormant Commerce Clause).  Even if Plaintiffs' construction of the statute were a "reasonable" one, which it is not, it should be rejected in order to "avoid[] the constitutional issue." *Legal Servs.*

*Corp.* v. *Velazquez*, 531 U.S. 533, 545 (2001).

For the same reasons, Plaintiffs' contention that certain Foreign Defendants[27] consented to personal jurisdiction in the United States by registering with the Connecticut Department of Banking under Section 36a-428g of the Connecticut General Statutes is similarly contrary to law. CAC ¶ 358.  Even if registration under the Connecticut statute would confer jurisdiction over Foreign Defendants in Connecticut, doing so would not subject Foreign Defendants to general jurisdiction in New York.  *Brown*, 814 F.3d at 629-30 (defendants' amenability to general jurisdiction in Maryland was irrelevant to whether defendant was amenable to jurisdiction in Connecticut).

## VI.   PLAINTIFFS' FAILURE TO SUFFICIENTLY PLEAD PROPER VENUE UNDER THE CLAYTON ACT PRECLUDES PERSONAL JURISDICTION OVER VENUE DEFENDANTS

Venue Defendants move to dismiss the Complaint for the additional reason that Plaintiffs have failed to establish venue and therefore personal jurisdiction in New York under the Clayton Act.  Asserting personal jurisdiction over Venue Defendants based on the Clayton Act's nationwide service of process provision would also require Plaintiffs to satisfy the Act's venue requirements. 15 U.S.C. § 22; *Daniel* v. *American Bd. of Emergency Medicine*, 428 F.3d 408, 424 (2d Cir. 2005); *BBSW*, 343 F. Supp. 3d at 197-98.  For venue to be proper in a district where a defendant is not "an inhabitant,"[28] the defendant must "be found or transact[] business" there.  15 U.S.C. § 22.  In the Second Circuit, the phrase "transacts business" refers to "business of any substantial character," which requires "some amount of business continuity and certainly more

---

[27] These Foreign Defendants are: RBS and UBS.

[28] For a corporation, "inhabitant" means its place of incorporation. *See, e.g.*, *Expoconsul Int'l, Inc.* v. *A/E Systems, Inc.*, 711 F. Supp. 730, 732-33 (S.D.N.Y. 1989).

than a few isolated and peripheral contacts."[29]  *Gates* v. *Wilkinson*, 2003 WL 21297296, at *1

(S.D.N.Y. June 4, 2003); *see also Pincione* v. *D'Alfonso*, 506 F. App'x 22, 24 (2d Cir. 2012).

In this analysis, only the contacts with the specific district in which the suit was brought

are relevant.  *Daniel*, 428 F.3d at 430.  Because Plaintiffs fail to plausibly allege that Venue

Defendants are "found" in or "transact[] business" in the Southern District of New York, *id.* at

423; *see BBSW*, 343 F. Supp. 3d at 197-98,[30] Plaintiffs fail to establish personal jurisdiction over

Venue Defendants.

## VII.    CONSIDERATIONS OF FAIR PLAY, SUBSTANTIAL JUSTICE, AND INTERNATIONAL COMITY COMPEL DISMISSAL

Before exercising either general or specific jurisdiction, the court must assess whether

exercising jurisdiction "would comport with fair play and substantial justice."  *Gucci*, 768 F.3d at

137.  Relevant factors may include: "(1) the burden that the exercise of jurisdiction will impose on

the defendant; (2) the interests of the forum state in adjudicating the case; [and] (3) the plaintiff's

interest in obtaining convenient and effective relief."  *Licci ex rel. Licci*, 732 F.3d at 170.

Plaintiffs overreach in their attempt to premise jurisdiction in New York on the London-

centric conduct alleged in the Complaint, as they have set forth no non-conclusory allegation that

Foreign Defendants engaged in manipulative conduct in or aimed at the United States.  *Madison*

*Capital Markets, LLC* v. *Starneth Europe B.V.*, 2016 WL 4484251, at *11 (S.D.N.Y. Aug. 23,

2016) (exercise of personal jurisdiction would not "comport with fair play and substantial justice,"

even though foreign defendant maintained an office in the forum, because plaintiff failed to allege

---

[29] To "be found" in a district "requires something more than 'transacting' business" there. *U.S.* v. *Watchmakers of Switzerland Info. Ctr.*, 133 F. Supp. 40, 42 (S.D.N.Y. 1955).  As Venue Defendants do not transact business in this district, they also are not found here.

[30] Decl. of D. Kläy ¶¶ 3-7 (Credit Suisse Group AG); Decl. of S. Dolmatch ¶¶ 3-8 (Lloyds Bank plc); Decl. of R. McCarty ¶¶ 3-12 (The Royal Bank of Scotland Group plc, NatWest Markets Plc, and National Westminster Bank Plc); Decl. of I. Jameson ¶¶ 2-4 (SMBCE); Decl. of J. Connors ¶¶ 4-8 (UBS Group AG and UBS AG).

sufficient suit-related contacts between defendant and the forum).  Due process is also not satisfied

where exercising jurisdiction threatens "international rapport." *Daimler*, 134 S. Ct. at 763.  Here,

Plaintiffs seek to exercise jurisdiction over the Foreign Defendants in New York based on an

alleged conspiracy to manipulate a benchmark administered, set, and regulated in London.

Accordingly, exercising due process here would run afoul of the same concerns emphasized by the

Supreme Court in *Daimler* regarding the "the risks to international comity" that might result from

an expansive view of general jurisdiction inconsistent with due process.  *Id.* at 762-63; *see also*

*Gucci*, 768 F.3d at 135.

Even if Plaintiffs could plausibly allege that one or more co-conspirators committed an

overt act in New York or the United States, exercising jurisdiction over a Foreign Defendant

through vicarious conspiracy jurisdiction, without plausible allegations that the Foreign Defendant

directed or controlled the alleged co-conspirator's overt act in the forum, would be similarly

unreasonable and threaten due process.  *See Laydon*, 2015 WL 1515358, at *6 ("personal

jurisdiction . . . would not comport with notions of fair play and substantial justice" in Euroyen

TIBOR conspiracy case when foreign defendants' TIBOR submitters were located outside the

United States).  Subjecting Foreign Defendants to jurisdiction based on such attenuated contacts

would not "merely be inconvenient," it "would violate our basic sense of fair play and substantial

justice—and deprive the defendants of the due process guaranteed by the Constitution."  *Metro.*

*Life Ins. Co.* v. *Robertson-Ceco Corp.*, 84 F.3d 560, 575 (2d Cir. 1996).

## VIII.   PLAINTIFFS HAVE FAILED TO SERVE THE SERVICE DEFENDANTS

Service Defendants move to dismiss the Complaint for insufficient service of process.  "On

a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service was

sufficient."  *Cassano* v. *Altshuler*, 186 F. Supp. 3d 318, 320 (S.D.N.Y. 2016).  "[S]ervice of

process fulfills an important due process function," *Sanchez* v. *Hoosac Bank*, 2014 WL 1326031, at *7 (S.D.N.Y. Mar. 31, 2014), and "[i]t is well-settled that [v]alid service of process is an essential element of personal jurisdiction." *Zagger* v. *Cty. of Suffolk*, 2010 WL 2671765, at *1 (E.D.N.Y. Jun. 28, 2010).[31]

Here, Plaintiffs have attempted to serve Service Defendants by mailing the summons and complaint to their respective headquarters in France.[32]  This is not sufficient under the Federal Rules, because service by mail is not permitted under French law.

Rule 4(f) governs the manner in which a corporation may be served outside the United States.  Fed. R. Civ. P. 4(f) and (h).  Two provisions of the rule are potentially pertinent here:  Rule 4(f)(1), which permits service "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention"; and Rule 4(f)(2)(A), which permits service in a foreign country "as prescribed by a foreign country's law for service in that country in an action in its courts of general jurisdiction."[33]  Plaintiffs have satisfied neither provision as to Service Defendants.

In *Water Splash, Inc.* v. *Menon*, the Supreme Court held that the Hague Convention does not "affirmatively *authorize*[] service by mail."  137 S. Ct. 1504, 1513 (2017) (emphasis in

---

[31] The Service Defendants' Rule 12(b)(5) motion does not prevent the Court from also addressing the Rule 12(b)(6) motion as it applies to the Service Defendants, *see Qader* v. *Cohen & Slamowitz*, 2011 U.S. Dist. LEXIS 2388, at *12-13 (S.D.N.Y. Jan. 10, 2011), though the Court is not required to reach the Rule 12(b)(5) motion if it dismisses the CAC on 12(b)(6) grounds, *see Taylor* v. *Westor Capital Grp.*, 943 F. Supp. 2d 397, 400 (S.D.N.Y. 2013) ("[D]ismissal under Rule 12(b)(6) renders unnecessary any further consideration of the parties' dispute over service of process under Rule 12(b)(5).").

[32] *See* ECF Nos. 101 (asserting that on March 28, 2019, Plaintiffs sent the summons and complaint to Crédit Agricole S.A.'s headquarters in Montrouge, France "via an international courier service," identified as UPS), 102 (asserting the same as to Crédit Agricole Corporate and Investment Bank), 182 at 2 (asserting that on May 29, 2019, Plaintiffs sent the summons and complaint to BNP Paribas's headquarters in Paris, France "via an international courier service," identified as FedEx).

[33] The remaining provisions of Rule 4(f) authorize service under certain circumstances pursuant to a letter rogatory or letter of request, Rule 4(f)(2)(B); service by the Clerk, Rule 4(f)(2)(C)(ii); or service pursuant to court order, Rule 4(f)(3).  None of these are applicable here.

original).  Accordingly, Plaintiffs must rely on Rule 4(f)(2)(A) to authorize mail service abroad. *See id.* (service by mail permissible only if "authorized under otherwise-applicable law"); *Wyndham Hotel Group Canada, ULC* v. *683079 Ontario Ltd.*, 2018 WL 2078704, at *5 (D.N.J. May 4, 2018) (because Hague Convention does not authorize service by mail, "the Court must examine whether Defendants were properly served under Rule 4").  This means that Plaintiffs' attempt to serve the Service Defendants in France would be sufficient only if service by mail were authorized under French law.  It is not. *See, e.g.*, *Trzaska* v. *L'Oréal USA, Inc.*, 2017 WL 6337185, at *3 (D.N.J. Dec. 12, 2017) (determining that "French law does not permit the service of process via mail").

Since neither the Hague Convention nor French law authorizes service by mail in France, Plaintiffs have failed to properly serve the Service Defendants. *See id.* at *2-3 (holding service by mail in France insufficient).  The Complaint should, therefore, be dismissed as to Service Defendants for insufficient service of process.

## CONCLUSION

As to Foreign Defendants, the Complaint should be dismissed for lack of personal jurisdiction, including for improper venue with respect to Venue Defendants.  With respect to Service Defendants, the Complaint should also be dismissed for improper service.

Dated:  August 30, 2019
New York, New York

/s/ Adam S. Hakki
Adam S. Hakki
Jerome S. Fortinsky
SHEARMAN & STERLING LLP
599 Lexington Ave
New York, New York 10022
Telephone: (212) 848-4000
ahakki@shearman.com
jfortinsky@shearman.com

John F. Cove Jr.
SHEARMAN & STERLING LLP
435 Mission Street, 25th Floor
San Francisco, CA 94150-2997
Telephone: (415) 616-1139
john.cove@shearman.com

*Attorneys for Defendant ICE Benchmark
Administration Limited*

/s/ Jonathan D. Schiller
Jonathan D. Schiller
Christopher E. Duffy
Leigh M. Nathanson
Demetri B. Blaisdell
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
Telephone: (212) 446-2300
jschiller@bsfllp.com
cduffy@bsfllp.com
lnathanson@bsfllp.com
dblaisdell@bsfllp.com

*Attorneys for Defendants Barclays PLC and
Barclays Bank PLC*

/s/ Joshua A. Goldberg
Joshua A. Goldberg
Jason Vitullo
Amy N. Vegari
Jeffrey C. Skinner
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
jgoldberg@pbwt.com
jvitullo@pbwt.com
avegari@pbwt.com
jskinner@pbwt.com

*Attorneys for Defendant BNP Paribas S.A.*

/s/ Joseph E. Neuhaus
Joseph E. Neuhaus
Alexander N. Gross
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Fax: (212) 558-3588
neuhausj@sullcrom.com
grossa@sullcrom.com

*Attorney for Defendants Crédit Agricole
Corporate and Investment Bank and Crédit
Agricole S.A.*

/s/ Joel Kurtzberg

Herbert S. Washer
Elai Katz
Joel Kurtzberg
Jason M. Hall
Adam S. Mintz
Lauren Perlgut
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
ekatz@cahill.com
jkurtzberg@cahill.com
jhall@cahill.com
amintz@cahill.com
lperlgut@cahill.com

*Attorneys for Defendants Credit Suisse
Group AG and Credit Suisse AG*

/s/ Jessica S. Carey

Brad S. Karp
Jessica S. Carey
Hallie S. Goldblatt
Maxwell Kosman
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, New York 10019
bkarp@paulweiss.com
jcarey@paulweiss.com
hgoldblatt@paulweiss.com
mkosman@paulweiss.com
Telephone: (212) 373-3000

*Attorneys for Defendant Deutsche Bank AG*

/s/ Damien J. Marshall

Damien J. Marshall
Joanna Wright
Yotam Barkai
Andrew Chesley
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards, 20th Floor
New York, New York 10001
Telephone: (212) 446-2300
dmarshall@bsfllp.com
jwright@bsfllp.com
ybarkai@bsfllp.com
achesley@bsfllp.com

*Attorneys for Defendants HSBC Holdings
plc and HSBC Bank plc*

/s/ Marc J. Gottridge

Marc J. Gottridge
Lisa J. Fried
Benjamin A. Fleming
HOGAN LOVELLS US LLP
390 Madison Avenue
New York, New York 10017
Telephone: (212) 918-3000
marc.gottridge@hoganlovells.com
lisa.fried@hoganlovells.com
benjamin.fleming@hoganlovells.com

*Attorneys for Defendant Lloyds Bank plc*

/s/ Andrew W. Stern

Andrew W. Stern
Tom A. Paskowitz
Alan M. Unger
Peter J. Mardian
SIDLEY AUSTIN LLP
787 7th Avenue
New York, New York 10019
Telephone: (212) 839-5300
astern@sidley.com
tpaskowitz@sidley.com
aunger@sidley.com
pmardian@sidley.com

*Attorneys for Defendant The Norinchukin Bank*

/s/ Richard D. Owens

Richard D. Owens
Douglas K. Yatter
Lilia B. Vazova
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022
Telephone: (212) 906-1200
richard.owens@lw.com
douglas.yatter@lw.com
lilia.vazova@lw.com

*Attorneys for Defendant Royal Bank of Canada*

/s/ David R. Gelfand

David R. Gelfand
Robert C. Hora
Mark D. Villaverde
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
dgelfand@milbank.com
rhora@milbank.com
mvillaverde@milbank.com

*Attorneys for Defendant Coöperatieve Rabobank U.A.*

/s/ David S. Lesser

Fraser L. Hunter, Jr.
David S. Lesser
Jamie S. Dycus
WILMER CUTLER PICKERING HALE
AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
Telephone: (212) 230-8800
Fax: (212) 230-8888
fraser.hunter@wilmerhale.com
david.lesser@wilmerhale.com
jamie.dycus@wilmerhale.com

*Attorneys for Defendants The Royal Bank of Scotland Group plc, NatWest Markets Plc, and National Westminster Bank Plc*

/s/ Steven Wolowitz

Steven Wolowitz
Henninger S. Bullock
Andrew J. Calica
Victoria D. Whitney
MAYER BROWN LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 506-2500
swolowitz@mayerbrown.com
hbullock@mayerbrown.com
acalica@mayerbrown.com
vwhitney@mayerbrown.com

*Attorneys for Defendant Société Générale*

/s/ Jon R. Roellke

Jon R. Roellke
Anthony R. Van Vuren
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Ave. NW
Washington, DC 20004
Telephone: (202) 739-5754
jon.roellke@morganlewis.com

Kenneth I. Schacter
MORGAN, LEWIS & BOCKIUS LLP
101 Park Ave
New York, New York 10178
Telephone: (212) 309-6000
kenneth.schacter@morganlewis.com

*Attorneys for Defendants Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui Financial Group Inc., and Sumitomo Mitsui Banking Corporation Europe Ltd.*

/s/ Eric J. Stock

Jarrett Arp (*pro hac vice forthcoming*)
Eric J. Stock
Jefferson E. Bell
Ryan J. Levan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166-0193
Telephone: (212) 351-4000
jarp@gibsondunn.com
estock@gibsondunn.com
jbell@gibsondunn.com
rlevan@gibsondunn.com

*Attorneys for Defendants UBS AG and UBS Group AG*