**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE: ICE LIBOR ANTITRUST LITIGATION

MEMORANDUM DECISION
AND ORDER

19 Civ. 439 (GBD)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GEORGE B. DANIELS, United States District Judge:

Plaintiffs,[1] on behalf of themselves and all others similarly situated, bring this action for, *inter alia*, a violation of Section 1 of the Sherman Antitrust Act (the "Sherman Act") against various foreign and domestic banks (collectively, "Defendants").[2] Specifically, Plaintiffs claim that Defendants engaged in a price fixing conspiracy to depress ICE LIBOR rates and returns to perform "collusive manipulation of ICE LIBOR." (Am. Compl., ECF No. 186, at 1, 23.) Defendants move to dismiss Plaintiffs' consolidated amended class action complaint against all

---

[1] Plaintiffs are comprised of: Putnam Bank, City of Livonia Employees' Retirement System, City of Livonia Retiree Health and Disability Benefits Plan, Hawaii Sheet Metal Workers Health & Welfare Fund, Hawaii Sheet Metal Workers Training Fund, Hawaii Sheet Metal Workers Annuity Fund, and Hawaii Sheet Metal Workers Pension Fund.

[2] Defendants are comprised of: Bank of America Corporation, Bank of America N.A., Merrill Lynch, Pierce Fenner & Smith Inc., Citigroup Inc., Citibank, N.A., Citigroup Global Markets Inc., JPMorgan Chase & Co., JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, Barclays PLC, Barclays Bank PLC, Barclays Capital Inc., BNP Paribas S.A., BNP Paribas Securities Corp., Crédit Agricole S.A., Crédit Agricole Corporate and Investment Bank, Credit Agricole Securities (USA) Inc., Credit Suisse Group AG, Credit Suisse AG, Credit Suisse Securities (USA) LLC, Deutsche Bank AG, Deutsche Bank Securities Inc., HSBC Holdings plc, HSBC Bank PLC, HSBC Bank USA, N.A., HSBC Securities (USA) Inc., Intercontinental Exchange, Inc., Intercontinental Exchange Holdings, Inc., ICE Benchmark Administration Limited (f/k/a NYSE Euronext Rate Administration Limited), ICE Data Services, Inc., ICE Data Pricing & Reference Data, LLC, Lloyds Bank plc, Lloyds Securities Inc., MUFG Securities Americas Inc., The Norinchukin Bank, Coöperatieve Rabobank U.A., Royal Bank of Canada, RBC Capital Markets, LLC, The Royal Bank of Scotland Group plc, NatWest Markets Plc (f/k/a The Royal Bank of Scotland plc), National Westminster Bank Plc, NatWest Markets Securities Inc. (f/k/a RBS Securities, Inc.), Société Générale, SG Americas Securities, LLC, Sumitomo Mitsui Banking Corporation, Sumitomo Mitsui Financial Group, Inc., Sumitomo Mitsui Banking Corporation Europe Ltd., SMBC Capital Markets, Inc., UBS Group AG, UBS AG, UBS Securities LLC, MUFG Bank, Ltd., and Mitsubishi UFJ Financial Group Inc.

Defendants for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (*See* Notice of Defs.' Joint Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Notice of Mot."), ECF No. 204.; Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Mem. in Supp. as to all Defs."), ECF No. 230; ICE Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Consolidated Am. Class Action Compl., ECF No. 232; Mitsubishi UFJ Financial Group, Inc.'s Notice of Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Mem. in Supp. as to Def. Mitsubishi"), ECF No. 245; MUFG Bank, Ltd.'s Notice of Mot. to Dismiss the Consolidated Am. Class Action Compl. ("Mem. in Supp. as to Def. MUFG Bank"), ECF No. 269.)[3] Defendants' motions to dismiss for failure to state a claim are GRANTED.

## I. FACTUAL BACKGROUND

ICE LIBOR is a system administered by the Ice Benchmark Administration (the "IBA")[4] that publishes daily "the rates at which panel banks 'could' obtain interbank unsecured funding from each other or similar institutions," which were represented as "the interest rate high-credit

---

[3] Defendants make additional arguments and file additional motions to dismiss for claims that pertain to certain subsets of the group of Defendants. In light of this Court's determination that the amended complaint should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), it need not address Defendants' motions to dismiss (1) with respect to all Defendants for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1), (*see* Notice of Mot.; Mem. in Supp. as to all Defs.); (2) with respect to the "Foreign Defendants" for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), (*see* Notice of Mot. at 3 n.1 (listing the "Foreign Defendants"); Mem. of Law in Supp. of Foreign Defs.' Mot. to Dismiss the Consolidated Am. Class Action Compl. for Lack of Personal Jurisdiction, Improper Venue, and/or Inadequate Service ("Mem. in Supp. as to Foreign Defs."), ECF No. 205; Mem. in Supp. as to Def. Mitsubishi; Mem. in Supp. as to Def. MUFG Bank; *see also* Notice of Mot. at 1, n. 1 (listing the "Foreign Defendants")); (3) with respect to the "Venue Defendants" for improper venue pursuant to Federal Rule of Civil Procedure 12(b)(3), (*see* Notice of Mot. at 3 n.2 (listing the "Venue Defendants"); Mem. in Supp. as to Foreign Defs.; Mem. in Supp. as to Def. Mitsubishi); or (4) with respect to the "Service Defendants" for inadequate service pursuant to Federal Rule of Civil Procedure 12(b)(5), (*see* Notice of Mot. at 3 n.3 (listing the "Service Defendants"); Mem. in Supp. as to Foreign Defs.; Mem. in Supp. as to Def. MUFG Bank).

[4] The IBA is incorporated under the laws of England and Wales and conducts its administration of ICE LIBOR from its registered office in London. (Mem. in Supp. as to Foreign Defs. at 1, 5.)

quality banks charge one another for short-term financing." (Am. Compl. at ¶¶ 3, 25 (citations omitted).) The "panel banks"[5] are a group of multinational banks that both participate in setting rates published by ICE LIBOR and also transact in financial instruments that are indexed to the rates published by ICE LIBOR. (*Id.* at ¶¶ 11–12.) The process by which ICE LIBOR determines the daily rate begins with the "Submission Question." Each business day, the panel banks are asked the question, "At what rate could you borrow funds, were you to do so by asking for and then accepting interbank offers in a reasonable market size just prior to 11am?" (*Id.* at ¶14.) The submissions are intended to be "a subjective determination of the rate at which a given Panel Bank could transact" on the interbank funding market. (*Id.* at ¶ 23 (citation omitted).) After receiving the panel banks' responses, the administrator of ICE LIBOR collects and validates the submissions and publishes the daily rates derived from those submissions. (*Id.* at ¶ 13.)

Plaintiffs allege that since at least the time of the class period, the interbank funding market has been "virtually non-existent," despite the fact that the Submission Question assumes that there is a funding market in which the banks are trading. (*Id.* at ¶¶ 3, 15, 18.) This, Plaintiffs claim, leaves ICE LIBOR susceptible to manipulation by Defendants because the panel banks are offering their opinions regarding something with which they are no longer involved. (*Id.* at ¶¶ 3–5, 15, 18, 398.)

Plaintiffs further assert that based on "objective statistical analyses of publicly available data," Defendants have observably manipulated ICE LIBOR during the class period, demonstrated by their submissions and the resulting rates that were "always, or nearly always" below where they should have been. (*Id.* at ¶ 24.) Specifically, to demonstrate their argument that the rates were

---

[5] Plaintiffs identify a subset of Defendants as members of the group of "panel banks." These Defendants include: Bank of America, Citigroup, JPMorgan, Barclays, BNP Paribas, MUFG, Credit Agricole, Credit Suisse, Deutsche Bank, HSBC, Lloyds, Norinchukin, Rabobank, RBC, RBS, Societe Generale, Sumitomo and UBS.

3

artificially depressed during that class period, Plaintiffs compare the ICE LIBOR rates during the class period against (1) the rate available for interest on excess reserves; (2) the rates at which the panel banks' actual debt traded contemporaneously; (3) General Collateral rates; and (4) the panel bank Defendants' contemporaneous CDS spreads. (*Id.* at ¶¶ 421–54.) Plaintiffs also rely upon Benford's Law[6] to demonstrate that the rates during the class period were below where they were expected. (*Id.* at ¶¶ 455–62.)

## II. LEGAL STANDARD[7]

### A. Rule 12(b)(6) Motion to Dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[8]

---

[6] Plaintiffs explain that Benford's Law "states that in sets of legitimately occurring data, each digit . . . should occur in certain predictable frequencies." (Am. Compl. at ¶ 43.)

[7] In light of this Court's determination that the amended complaint should be dismissed for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), it need not address Defendants' claims that the amended complaint should be dismissed on alternative grounds.

[8] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

4

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

## III. PLAINTIFFS' CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FAILS TO STATE A CLAIM[9]

The dispositive issue before this Court is whether Plaintiffs' amended complaint fails to state a claim of price fixing, as it is the only legal claim included in the amended complaint. (*See*

---

[9] While this Court finds that the amended complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6), it also finds, on alternative grounds, that Plaintiffs have failed to sufficiently allege that the Foreign Defendants are subject to personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2). On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), plaintiffs bear the burden of establishing personal jurisdiction. *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012)). The Second Circuit has held, including with respect to claims that a group of defendants conspired to manufacture LIBOR rates, that a plaintiff may demonstrate personal jurisdiction by alleging either that Defendants manipulated LIBOR rates in the United States or that there was a "causal relationship" between a group of defendants' conspiracy to set rates and their respective trading activities in the United States. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 83–84 (2d Cir. 2018) (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). Here, the Foreign Defendants are all incorporated and hold their principal place of business outside the United States. (*See* Am. Compl. at Part II.B; Mem. in Supp. as to Foreign Defs. at 33.) Additionally, Plaintiffs fail to properly allege any improper conduct on the part of the Foreign Defendants that would have taken place within the United States, including the setting of the ICE LIBOR rate itself, which was administered by a U.K. company from its London headquarters. (Mem. in Supp. as to Foreign Defs. at 1, 5.) Indeed, Plaintiffs make only conclusory allegations that the Foreign Defendants engaged in some activity in the United States, or that their foreign activity had a causal connection to the alleged conspiracy in the United States, without providing any factual basis for these assertions. Moreover, not only is the amended complaint entirely devoid of any factual basis or evidence to support these assertions, but Plaintiffs' claims themselves are contradicted by Defendants' evidence. (*See* Mem. in Supp. as to Foreign Defs. at 6 n. 9 (listing and describing the sworn declarations provided by Defendants, all which contradict Plaintiffs' claim).) Therefore, even if this Court did not find that the amended complaint should be dismissed for failure to state a claim pursuant to Rule 12(b)(6), it

5

Am. Compl. at Part VII.) In order to demonstrate a violation under Section 1 of the Sherman Act, a plaintiff must demonstrate, in part, "a combination or some form of concerted action between at least two legally distinct economic entities." *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 263 (2d Cir. 2001) (citation omitted). Here, Plaintiffs argue that during the class period, the ICE LIBOR rate was lower than it should have been at the time, that Defendants had a profit-based motive to work together to depress this rate, and that Defendants colluded to set prices by responding to the Submission Question in a manner that would result in a depressed rate. The amended complaint, however, is made up of almost entirely conclusory allegations and is essentially devoid of any evidence, direct or circumstantial, to support the conclusion that Defendants colluded with one another. Therefore, Plaintiffs' amended complaint cannot withstand a motion to dismiss for failure to state a claim.

### 1. Plaintiffs Fail to Properly Allege that Defendants Acted in a Conspiracy or Engaged in Collusion.

Plaintiffs point to no evidence, nor do they offer anything beyond conclusory statements and accusations, to support their claim that Defendants ever colluded, or let alone discussed, their responses to the daily Submission Question. There is no basis to assume, in the absence of *any evidence whatsoever*, that Defendants ever discussed lowering the rate with one another.

Indeed, in an attempt to support their claim, Plaintiffs outline meetings that Defendants attended, which afforded them, as Plaintiffs describe, an "opportunity to conspire" and an "opportunity to collude." (Am. Compl at ¶¶ 508–09.) Plaintiffs' argument, however, is based wholly in speculation and wishful thinking as to what Defendants *might* have done. As Defendants correctly assert in their joint motion, "Plaintiffs have pointed to no communications, no regulatory

---

would find that the amended complaint should be dismissed with regard to the Foreign Defendants pursuant to Rule 12(b)(2).

6

investigations, no cooperating witnesses, or any other facts that could conceivably convert their claim into more than speculation." (Mem. in Supp. as to all Defs. at 1; *see also id.* at 20 ("as to the meetings Plaintiffs refer to with any specificity, they still fail to allege any communications, or even a topic of discussion, that indicate the existence of any conspiratorial agreement").) It is inappropriate to engage in guesswork regarding what topics Defendants *might* have discussed, without providing any evidence upon which this Court may rely.

Moreover, Plaintiffs place a particularly heavy emphasis on the Alternative Rates Committee ("ARRC") meetings, which Plaintiffs note were "strictly confidential" and "closed-door affairs." (Am. Compl. at ¶¶ 511–58.) As Plaintiffs themselves acknowledge, however, and as Defendants point out, "the agenda, participant lists, and minutes of every AARC meeting are publicly available" and "several regulators . . . attended every one of those meetings." (Mem. in Supp. as to all Defs. at 20–21 (emphasis in original); *see also* Am. Compl. at ¶¶ 512–17.) Presumably, discussions regarding illicit matters would have been made obvious from the minutes of these meetings, or alternatively, regulators present at the meeting would have been on notice—and likely would have initiated an investigation—had they been privy to any conversations regarding price fixing. Therefore, if these discussions had taken place during the meetings that Plaintiffs identify, it is reasonable to assume that there would be at least *some* evidence of their occurrence. Indeed, the lack of evidence arising from these meetings leads to a conclusion opposite of that which Plaintiffs attempt to allege.

Additionally, it is a practical reality that, in order to maintain a consumer base, businesses will set prices at a competitive rate.[10] Therefore, it does not defy reason that if Defendants wanted

---

[10] This Court refers to the "hot dog analogy" it described during oral argument. Specifically, a reasonable person would not expect that if one hot dog vendor sells hot dogs for $3.00, another on the same block would sell them for $20.00. And, indeed, if one hot dog vendor sells hot dogs for $3.00 and three others sell hot dogs for $3.05, this instance of parallel pricing does not, on its own, demonstrate that there was any

7

to remain competitive with other banks in the market, they might attempt to lower their answers to the Submission Question and stay at least on par with the resulting rates. Indeed, a Defendant would not have been acting improperly if, upon learning that the answers provided by other Defendants were low, or that the ICE LIBOR rate itself had been low recently, it adjusted its answer to the Submission Question accordingly. This alone does not demonstrate that Defendants agreed to, or even discussed, lowering the rate as a group. Notably, and as Defendants point out, Plaintiffs fail to assert any evidence of parallel conduct among Defendants to demonstrate that on any particular day, they acted in conjunction to lower the rate. (Mem. in Supp. as to all Defs. at 22–24.) Moreover, in their motion, Defendants provide a chart which "combines the Complaint's separate charts for each Defendant Bank's 3-month ICE LIBOR submissions," which actually demonstrates that there was consistent variation among the panel banks' submissions. (*See id.* at 23.) Notably, Plaintiffs do not ever assert precisely what the ICE LIBOR rate should have been during the class period. It is therefore difficult to determine whether or not there was parallel pricing among Defendants in the first instance.

In the context of a claim for price fixing, asserting that there was collusion simply because Defendants provided a similar answer to the Submission Questions, without any other evidence, is not the same as asserting, with evidence, that Defendants agreed to collude and set the rates to a specific price. Indeed, as the Second Circuit has held, "an allegation of parallel conduct coupled with only a bare assertion of conspiracy is not sufficient to state a Section 1 claim." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010). Plaintiffs, therefore, cannot rely solely upon the similar rates and assertions not based in fact or evidence to support their claim.

---

collusion. (*See* Tr. of Oral Arg. dated Jan. 30, 2020 at 53:7–15.) Although Plaintiffs claim that this was only "part of the story," (*id.* at 15:16), this Court strains to locate evidence or facts to support what it assumes would be the other part—that is, Defendants' collusion.

8

In sum, unless Plaintiffs can demonstrate sufficient circumstantial evidence that there was a conspiracy among Defendants, *i.e.*, "plus factors," their amended complaint simply asserting similar rates and an opportunity to conspire cannot survive Defendants' motion to dismiss.

### 2. Plaintiffs' Purported "Plus Factors" Fail to Support the Inference That Defendants Engaged in a Conspiracy.

Recognizing that "smoking gun" evidence of a conspiracy may be difficult to identify, the Second Circuit has held that a plaintiff attempting to allege a conspiracy under the Sherman Act may instead point to "plus factors" that, when read in conjunction with other evidence, support the inference that there was a conspiracy. *Mayor and City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 135–36 (2d Cir. 2013) (citing *Apex Oil Co. v. DiMauro*, 882 F.2d 246, 253–54 (2d Cir. 1987) ("[A] plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.")). A plaintiff may do this by pointing to, for example, "a common motive to conspire; evidence that the parallel acts were against the apparent economic self-interest of the individual alleged conspirators; or evidence of 'a high level of interfirm communications.'" *In re Publication Paper Antitrust Litigation*, 690 F.3d 51, 62 (2d Cir. 2012) (citation omitted). A court must be careful, however, not to regard activity that may "just as easily turn out to have been rational business behavior" as a "plus factor." *Mayor and City Council of Baltimore, Md.*, 709 F.3d at 137. Although it is not clear that Plaintiffs have sufficiently alleged parallel pricing by Defendants, this Court construes all reasonable inferences in favor of the non-moving party, and therefore will consider Plaintiffs' proffered "plus factors." Regardless, however, and despite Plaintiffs' claims regarding alleged "plus factors," Plaintiffs still fail to provide sufficient reason that this Court should infer that there was a conspiracy or any collusion among Defendants.

### a. Plaintiffs Have Not Sufficiently Demonstrated That Defendants Had a Motive to Depress ICE LIBOR Rates, Either Alone, or in a Conspiracy, or That They Colluded.

Plaintiffs claim that Defendants had a profit-based motive to artificially depress the rates. (*See* Am. Compl. at ¶¶ 559–75.) First, as Defendants properly note, Plaintiffs have not offered any evidence of motive that is specific to any one Defendant. It is inappropriate for Plaintiffs to rely upon aggregate data to demonstrate how an entire group of Defendants might stand to profit. (Mem. in Supp. as to all Defs. at 24–25 (citing *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, 213 F. Supp. 3d 631, 662–64 (S.D.N.Y. 2016).)

Moreover, the most notable weakness in Plaintiffs' assertions regarding Defendants' alleged motive is that it defies logic. As Defendants explain, each of the defendant banks both makes and receives payments based on the ICE LIBOR rates, and therefore, would stand to be injured in the same manner that it would stand to benefit. (Mem. in Supp. as to all Defs. at 25.) Plaintiffs attempt to side-step this flaw in their reasoning by largely focusing on the panel banks' "funding desks." Plaintiffs allege that the funding desks in particular benefit from a lower rate, that the individuals running the desk are motivated by potential bonuses resulting from their profitability, and that the other units within the panel banks are "generally indifferent to the USD ICE LIBOR rate." (*See* Am. Compl. at ¶¶ 58–60, 561–70.) Plaintiffs again, however, provide no evidence that this is true, nor do they assert anything beyond bare-boned allegations that the funding desks were responsible in orchestrating the panel banks in a manner so that they personally might benefit. Therefore, Plaintiffs have not sufficiently demonstrated that Defendants were motivated to engage in price fixing.

Additionally, Plaintiffs rely upon the opportunities during which Defendants *could have* engaged in conversations regarding manipulating the ICE LIBOR rate. (*See* Am. Compl. at ¶¶ 576–81.) However, and as described above, simply alleging an opportunity to conspire without

10

providing any evidence whatsoever that any such discussions actually took place is insufficient to survive a motion to dismiss. As is also described above, the fact that Plaintiffs cannot point to any evidence derived from minutes of, or investigations arising out of, these meetings is detrimental to their argument. Therefore, while this Court will consider Defendants' opportunity to engage in these discussions in conjunction with the other "plus factors," it finds that this argument holds little to no weight, given that Plaintiffs' allegations as to any collusion appear to be no more than hopeful assertions.

### b. Plaintiffs Have Not Sufficiently Demonstrated the Reliability of the Common Stimuli or Statistical Analyses Against Which They Analyze the ICE LIBOR Rate.

A large portion of Plaintiffs' amended complaint is dedicated to their claim that various "objective" statistical analyses demonstrate that ICE LIBOR rates were depressed during the class period and were therefore clearly artificially manufactured by Defendants. (*Id.* at ¶¶ 414–64, 585– 86.) Additionally, Plaintiffs place particular emphasis on their analysis of the rates as they compare to Benford's law. Plaintiffs' claims, however, are unreliable and dubious because they simply assert that there should be certain, specific relationships between ICE LIBOR and other financial metrics, but do not cite to any empirical or academic sources to support these assertions. (*See id.*) Moreover, despite relying upon these metrics, Plaintiffs do not at any point in their amended complaint actually indicate what they believe the ICE LIBOR rate *should* have been at the time.

Plaintiffs rely most heavily upon Benford's Law, alleging that their analysis of the ICE LIBOR rates during the class period demonstrate "a statistical certainty of greater than 99% that [Defendants'] submissions did not conform to Benford's Law," which they argue leads to the "inescapable conclusion" that Defendants artificially manufactured the rates. (*Id.* at ¶ 46 (emphasis omitted).) While Plaintiffs assert that "Benford Tests" are applied by the Internal

Revenue Service and even some of the defendant banks to monitor accounting irregularities, they provide no support for their claim that "legitimately created financial data sets generally follow Benford's Law [and] illegitimate data sets generally do not," or that this is an objective analysis upon which this Court should rely. (*See id.* at ¶ 43.) Moreover, this Court has been unable to identify any other court in this jurisdiction, or even the United States, that appears to have ever credited Benford's law as a reliable and objective test against which to compare trading and loan rates. This Court therefore declines, without having seen any empirical evidence provided by Plaintiffs, to be the first to do so.

Plaintiffs additionally point to the relationships between the ICE LIBOR rates during the class period and (1) the rate available for interest on excess reserves; (2) the rates at which the panel banks' actual debt traded contemporaneously; (3) General Collateral rates; and (4) the panel bank Defendants' contemporaneous CDS spreads. (*Id.* at ¶¶ 421–54.) More specifically, Plaintiffs assert that that the interest on excess reserves "should be a floor," (*id.* at ¶ 422), the yield on a Defendant bank's debt issuances "should be equivalent to its corresponding USD ICE LIBOR submission," (*id.* at ¶ 428), the general collateral rates, as secured rates, "should be substantially lower" than the ICE LIBOR rates, (*id.* at ¶ 441), and Defendants' CDS spreads during the class period, when compared to the ICE LIBOR rates, demonstrate that Defendants' submissions "were untethered to the perceived creditworthiness of the respective banks," (*id.* at ¶ 453). Again, however, Plaintiffs make these assertions but do not provide *any* support for their theories about what the relationships between these factors and the ICE LIBOR rate should be. Absent any support for Plaintiffs' claims, this Court cannot analyze as evidence Plaintiffs' mere beliefs that these tests are reliable.

### c. Plaintiffs Cannot Save Their Argument By Simply Claiming That Defendants Have Previously Engaged in Similar Behavior and Therefore Recidivism is Likely.

Plaintiffs assert that "many leaders and other officials . . . have been investigating USD ICE LIBOR, recognized many of its problems, and are involved in attempts to reform or replace it," (*id.* at ¶ 582), and moreover, that recidivism is likely because the panel banks have previously engaged in benchmark price fixing, (*id.* at ¶¶ 587–626). Although Plaintiffs reference previous government investigations of specific Defendants and assert that "[a]lmost all of the Defendants have pled guilty to criminal charges related to benchmark-rigging," (*id.* at ¶ 591), they offer little argument as to why those facts are relevant to the instant case. Indeed, Plaintiffs' only claim of any connection between any prior violations and their current claim is that there are similar structural characteristics in prior schemes because the other benchmarks "were calculated through trimmed averages of submissions by a panel of nominally independent banks," and that this prior experience would serve as a "blueprint" for Defendants' rate-setting of ICE LIBOR. (*Id.* at ¶ 590.) In response, Defendants argue that Plaintiffs' claim as to potential recidivism "is inapplicable to many Defendants and inadequate as to all of them" because Plaintiffs assert incorrect facts and the investigations to which Plaintiffs point relate to benchmarks other than ICE LIBOR. (*See* Mem. in Supp. as to all Defs. at 45–47.)

This Court need not reach a determination as to whether Plaintiffs' argument on this point is compelling. Even assuming, *arguendo*, that this Court found that Plaintiffs' argument supports the conclusion that Defendants have previously engaged in this behavior, and therefore truly did have a "blueprint" to act similarly in the future, "[plus factors] must still lead to an inference of conspiracy." *Mayor and City Council of Baltimore, Md.*, 709 F.3d at 137 (citation omitted). Indeed, the analysis of "plus factors" is meant to determine whether there is a "reasonable expectation that discovery will reveal evidence of illegality." *Arista Records, LLC v. Doe 3,* 604

F.3d 110, 120 (2d Cir. 2010) (citing *Twombly,* 550 U.S. at 556 (alterations omitted)). Plaintiffs argue only that Defendants' alleged prior conduct serves as a "blueprint" for recidivism—in other words, that Defendants have the means to do it again.

Indeed, even when viewed in conjunction with the alleged parallel conduct and other "plus factors," including that *if* Defendants acted, they would have been acting contrary to their unilateral self-interest, Plaintiffs' "blueprint" theory does not lead to the reasonable conclusion that Defendants actually engaged in a conspiracy. Considering Plaintiffs' lack of evidence with respect to essentially *all* of their arguments, as well as the manner in which Defendants stood to be harmed themselves by manually setting a depressed rate, Plaintiffs have offered only skeletal allegations of the possibility of a conspiracy. Scattered, unsupported claims that do not together demonstrate any logical reason why Defendants might have colluded, particularly when it seems—based on Plaintiffs' own admissions—that direct evidence would be available to Plaintiffs had there been collusion, will not withstand a motion to dismiss. Therefore, even considering all of the "plus factors" offered by Plaintiffs, Plaintiffs have not sufficiently alleged, either through direct or circumstantial evidence, that Defendants engaged in collusion in order to artificially manufacture the ICE LIBOR rates. Plaintiffs' amended complaint should be dismissed against all Defendants, pursuant to Federal Rule of Civil Procedure 12(b)(6).[11]

---

[11] In light of this Court's determination that the amended complaint does not sufficiently support a claim that there was a conspiracy among Defendants—a necessary factor to survive a motion to dismiss on a claim of price fixing—this Court need not address Defendants' alternative theories under which they assert the amended complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

14

## IV. CONCLUSION

Defendants' motion to dismiss, (ECF Nos. 204, 245, 269), are GRANTED. The Clerk of Court is directed to close these motions accordingly.

Dated: New York, New York
      March 26, 2020

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge